PERPETUAL BUILDING AND LOAN ASSOCIATION OF COLUMBIA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 64575.     Filed July 15, 1960.

---

[4] Cal. Pen. Code sec. 995.

*Charles F. Cooper, Esq.*, for the petitioner.
*George W. Calvert, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined deficiencies in income tax, declared value excess-profits tax, excess profits tax, and additions to the tax under section 291(a), Code of 1939, as follows:

| Year | | Addition to tax, sec. 291(a) |
|---|---|---|
| | *Income tax* | |
| 1945 | $4,404.11 | $1,101.03 |
| 1946 | 2,132.88 | 533.22 |
| 1947 | 26,266.33 | 6,566.58 |
| 1948 | 19,844.93 | 4,961.23 |
| 1949 | 3,661.60 | 915.40 |
| 1950 | 13,755.94 | 3,438.99 |
| 1951 | | 2,491.53 |
| | *Declared value excess-profits tax* | |
| 1945 | 40,567.95 | 10,141.99 |
| | *Excess profits tax* | |
| 1945 | 217,316.02 | 54,329.01 |

The issues presented are:

1. Whether the petitioner was exempt from taxation under the provisions of section 101(4) of the Code of 1939 during the years 1945 to 1951, inclusive; (2) whether petitioner is liable for additions to the tax under section 291(a), *supra,* for said years; (3) whether the statute of limitations has expired for assessment and collection of the deficiencies due from petitioner for said years; and (4) whether certain deductions for salary and payroll expenses allowed in the statutory notice as allocable from Cooper Agency in implementation of section 45 for the years 1950 and 1951 are to be disallowed (as claimed by respondent in an amended answer) to the extent that deductions for such items are duplications of items allowed by this Court to the taxpayer in the case of *Cooper Agency,* 33 T.C. 709.

FINDINGS OF FACT.

Perpetual Building and Loan Association of Columbia (hereinafter sometimes referred to as Perpetual) was chartered as a corporation under the laws of the State of South Carolina on May 30, 1914. The charter stated that the general purpose of the corporation and the nature of business it proposed to do was—

that of a Building and Loan Association, lending its funds to its members and others on the security of real estate and personal property, and in investing in any other business that may be deemed for the benefit of its stockholders, and otherwise conducting its business according to the customs and usages of Building and Loan Associations.

At all times during the period from January 1, 1944, until March 25, 1945, the following individuals served as officers of Perpetual:

> John Hughes Cooper, president.
> J. S. Cooper, vice president.
> Charles F. Cooper, secretary and treasurer.

John Hughes Cooper died March 25, 1945. In June 1945, Charles F. Cooper became president of Perpetual. At all times thereafter, here pertinent, the following individuals served as officers and directors of Perpetual:

Charles F. Cooper, president.
Frank B. Cooper, vice president.
James D. Cooper, treasurer.
Rosa M. Romanstine, secretary.

Said individuals were elected to the stated offices each year without opposition at meetings which were mainly attended only by the officers themselves. Charles was the dominant figure in carrying on Perpetual's business activities.

Perpetual's offices were with or adjacent to those of Biltmore Homes, Inc., Cooper Agency, and Mutual Savings and Loan Company.

Charles, James, and Frank Cooper were brothers. Virginia Cooper was Charles' wife. John Hughes Cooper was the uncle of Charles, James, and Frank. William P. Cooper and Daisy Cooper were their father and mother. J. S. Cooper was their cousin.

On or about June 13, 1946, Perpetual (by its president, Charles F. Cooper) filed Form 1027 with the Treasury Department, which is the questionnaire for building and loan associations claiming exemptions under section 101 (4) of the Code of 1939.

On June 13, 1946, Perpetual filed a "United States Annual Return of Organization Exempt from Income Tax Under Section 101 of the Internal Revenue Code, or Under Corresponding Provisions of Prior Revenue Acts," (Form 990) for the year 1945 with the collector of internal revenue for the district of South Carolina. On said form, Perpetual stated that its assets and liabilities at December 31, 1945, were as follows:

ASSETS

| | |
|---|---|
| Cash on hand and in banks | $54,441.82 |
| Mortgage and share loans to members | 44,140.87 |
| Total assets | 98,582.69 |

LIABILITIES

| | |
|---|---|
| Payments on shares | 98,267.49 |
| Reserves | 315.20 |
| Total liabilities | 98,582.69 |

On October 21, 1946, respondent issued a ruling to Perpetual stating that it was the respondent's opinion, based upon the evidence presented, that Perpetual was exempt from Federal income tax under the provisions of section 101 (4) of the Code of 1939.

Thereafter, for each of the years 1946 to 1951, inclusive, Perpetual filed Forms 990 with the collector of internal revenue for the district of South Carolina.

Perpetual did not file any corporation income tax returns, Form 1120 or 1121, for any of the years 1945 to 1951, inclusive.

On December 30, 1944, Perpetual amended its bylaws to provide that the bylaws could be altered or amended by a vote of a majority of the directors at any regular or special meeting of the board of directors. Prior thereto, the bylaws could be changed only by a vote of the majority of the whole number of shareholders represented at a regular meeting, or at a special meeting, called for that purpose. Perpetual also provided that all resolutions of its directors, passed at any meeting, concerning matters provided in the bylaws would supersede the provisions of any bylaws that were inconsistent therewith and that the resolutions would automatically constitute amendments to the bylaws.

During the years 1945 to 1951, inclusive, Perpetual was authorized to issue Fully Paid shares, Optional-Payment shares, Installment Loan shares, Prepaid Loan shares, and Prepaid Installment shares. Prepaid Installment shares could either be Investment or Capital Prepaid Installment shares.

The description of Fully Paid shares, Optional-Payment shares, Installment Loan shares, Prepaid Loan shares, and Prepaid Installment shares as shown in Perpetual's passbook is as follows:

(a) Fully Paid Shares, which shall be those shares on which the full par value has been paid; and on which all dividends, as and when declared, shall be payable in cash, or equivalent, to the member.

(b) Optional-Payment Shares, which shall be those shares on which an initial payment has been made and subsequent payments are thereafter made at the option of the member in any amount at any time desired; and on which share accounts all dividends, as and when declared, shall be credited to the share account of the member, or payable in cash, or equivalent, at the option of the member. When payments on Optional-Payment Shares, together with dividends credited thereto, equal the full par value thereof, the same may be exchanged by the member for certificates representing Fully-Paid Shares without cost.

(c) Installment Loan Shares, which shall be those shares subscribed to by borrowing members, payable in installments, or otherwise, as fixed by the loan agreement; which shares shall be pledged to the Association by the member, as additional security for the loan, or other indebtedness; and all payments on such shares, together with all dividends, as and when declared shall be applied semi-annually to any balance due by the member to the Association.

(d) Prepaid Loan Shares, which shall be those shares subscribed for in full by the member, who shall pay thereon, upon subscription and issuance, at least ten (10%) of the par value thereof, and shall thereupon pledge all the shares to the Association as security for the payment of the balance due thereon, pursuant to a loan agreement approved by the Board of Directors;

and all payments, as and when made by such member, except the said initial payment, and also all dividends, as and when declared, shall be applied to the balance due to the Association on the share loan.

(e) Prepaid Installment Shares, which shall be those shares on which the member has paid an initial payment of at least ten (10%) per cent of the total par value of a designated number of shares to be purchased; and on which subsequent installments shall be payable at the option of the member; and on which share account all dividends, as and when declared, must be credited to the share account, until the full par value of the number of shares designated to be purchased has been paid, and the shares are thereby matured; and no dividends on such share accounts shall be payable before maturity, unless all such shares of the member, including all payments, dividends, and credits thereon, are surrendered and tendered to the Association for repurchase; provided that, after the initial payment and before maturity, redemption or repurchase of the share account by the Association, all such shares thus designated to be purchased shall be reserved for the account of such member, and such member shall have a continuing option to pay the balance due on said shares and have Fully-Paid Shares issued therefor.

Perpetual's share accounts did not require the holder to pay a definite amount each month, but allowed the holder to make payments as he saw fit.

Perpetual did not issue stock certificates. All share accounts were represented by share account books (passbooks) containing a certificate of membership and evidencing the participation value of the account with the exception of Fully Paid share accounts which could be represented by a separate membership certificate.

By resolution adopted on December 30, 1944, Perpetual provided for Investment Prepaid Installment shares and Capital Prepaid Installment shares. This resolution provides, in part, as follows:

BE IT RESOLVED, that Prepaid Installment Shares, as defined and authorized under Article III, Section (e), of the bylaws of the Association, may at any time hereafter, in the discretion of the Directors, be issued pursuant to subscription therefor in any Series of Shares, and designated by the Directors, in their discretion, at the time of subscription or issuance, in either of two ways and placed in either of two categories, as follows: (1) "Investment" Prepaid installment Shares may be issued pursuant to any subscription therefor approved by the Directors, in those cases where the initial payment on such shares is made in money or other thing of certain value in the judgment of the Directors. Such "Investment" Prepaid Installment Shares shall be eligible from issue for credit with all regular, semi-annual dividends declared by the Directors, at all of the same times, and to the same extent in every case, as other types of shares authorized or outstanding in the same Series and eligible for such dividends.

(2) "Capital" Prepaid Installment Shares may be issued, pursuant to any subscription therefor approved by the Directors, in any case where the subscriber so requests, or where the initial or subsequent credits on such prepaid installment share account are, or will be, allowed by the Directors in exchange for services or properties of any kind or nature which the Directors consider to be of uncertain, contingent, or indeterminate value at the time of the subscription or issuance of said shares or credits on account thereof. * * *

Capital Prepaid Installment shares could not be redeemed or withdrawn by the holder until Perpetual had realized or became reasonably assured of realizing the value of all credits allowed for the property. Until the directors made a finding to that effect, the Capital Prepaid Installment shares were also not eligible for and did not receive any dividends. However, after the directors made such a finding, the Capital shares became eligible for dividends. After all other shares had received their regular semiannual dividends, Perpetual credited so-called stock dividends to the Capital Prepaid Installment shares in amounts determined by its directors on the basis of accumulated surplus, reserves, and undivided profits then existing.

The holder of a Capital Prepaid Installment account receiving such a "stock" dividend had the option of having the amount credited to his existing account thereby increasing its value or using the amount toward procuring additional accounts.

After receiving a so-called stock dividend credit, Capital Prepaid Installment shares could be converted to Investment Prepaid Installment shares upon the holder's request and become eligible for regular semiannual dividends. The directors also had the power to convert a Capital Prepaid Installment share into an Investment Prepaid Installment share after it had received a "stock" dividend. The Capital shares were automatically converted into Investment Prepaid Installment shares if the holder accepted any of the regular semiannual dividend credits made to holders of other types of shares.

On December 30, 1944, Perpetual adopted a resolution providing that regular, semiannual dividends would be placed first to the credit of Optional Payment and Fully Paid shares, then to Investment Prepaid Installment shares at a fixed rate not exceeding 4 per cent per annum on a cumulative basis and that this would be the extent of such shareholders' participation in the profits and surplus reserves of Perpetual. All reserves remaining thereafter were subject to allocation to outstanding Capital Prepaid Installment shares as "stock" dividends.

In the event of liquidation or distribution of Perpetual's assets, all assets were to be first applied toward redemption and payment in full of all Optional Payment and Fully Paid shares, with accumulated dividends at said fixed rate, then of all Investment Prepaid Installment shares, with accumulated dividends at said fixed rate. Any and all remaining assets were to be distributed in full to holders of outstanding Capital Prepaid Installment shares.

In addition to cash, Perpetual would accept real estate suitable for homes in payment for shares, and in such instances, it took the property at its appraised value.

One of the reasons for Perpetual's using Capital Prepaid Installment shares was to allow an individual who had turned property

in for such shares to receive the full value of the property when it was later sold by Perpetual.

On December 19, 1944, Perpetual, Series 144, purchased 17 acres on Forest Drive.

On December 31, 1944, Perpetual, Series 144, acquired 331 acres of farmland, and 12 lots in Victory Gardens from Small Farms Company, a firm organized by John Hughes Cooper, J. S. Cooper, and Charles.

On December 30, 1944, Perpetual authorized the creation and issuance of a new series of shares designated as Series No. 144. Certain properties were tendered to and accepted by the directors based upon valuations which included $48,138 as the anticipated profits on the property transferred. The property transferred and its agreed valuation was as follows:

| | |
|---|---:|
| North Highlands (Haynesworth property) 300 acres | $25,200.00 |
| Forest Dale: | |
| 58 lots at $500 | 29,000.00 |
| 14 lots at $1,000 | 14,000.00 |
| Victory Gardens: | |
| 12 lots at $500 | 6,000.00 |
| Mortgages on 12 improved lots | 32,823.26 |
| Total | 107,023.26 |

The following were stated as the liabilities of Series No. 144 created on December 30, 1944:

| | |
|---|---:|
| Mortgage on Haynesworth property | $8,000.00 |
| Other mortgages (10) | 15,500.00 |
| J. H. Cooper shares | 21,986.00 |
| J. S. Cooper shares | 33,501.00 |
| Charles F. Cooper shares | 26,763.00 |
| W. P. Cooper shares | 1,273.26 |
| Total | 107,023.26 |

On June 30, 1945, Perpetual, Series 144, transferred certain assets and liabilities to Series 63045 of Mutual Savings and Loan Company (hereinafter sometimes called Mutual). Among the assets transferred were 17 acres of Forest Drive which Perpetual had bought from Simon Faust on December 19, 1944, and 331 acres of unimproved property and 12 unimproved building lots in Victory Gardens subdivision which Perpetual had acquired from Small Farms Company on December 30, 1944.

Mutual was granted an exemption from income tax under section 101(4), Code of 1939, under a Bureau ruling dated November 8, 1946. Charles, Frank, and James were the officers of Mutual and actively managed its business affairs.

On December 31, 1945, Perpetual authorized the creation and issuance of a new series of shares designated as Series 146. Perpetual

accepted for the new series all of the assets, liabilities, and share accounts of Mutual, Series 63045. The share accounts included those of J. Hughes Cooper's estate, Charles F. Cooper, J. S. Cooper, and William P. Cooper. Also included was the Capital Prepaid Installment share account of William P. Cooper with a paid credit of $9,093.04 based on a so-called stock dividend of 4 shares to 1 share declared by Mutual, Series 63045. Among the assets received by Perpetual, Series 146, were the 17 acres on Forest Drive, the 331 acres of unimproved property, and the 12 building lots in Victory Gardens subdivision that Perpetual, Series 144, had transferred to Mutual, Series 63045, on June 30, 1945.

On December 31, 1945, Perpetual authorized the creation and issuance of a new series of shares designated as Series No. 145. It accepted from Mutual, Series 81544, certain assets together with a corresponding amount of other liabilities and share accounts. The share accounts were as follows:

| Name | Type of shares | Maturity value | Share credits on Dec. 31, 1945 |
|------|----------------|----------------|-------------------------------|
| Frank B. Cooper | E(Inv.—PPI) | $30,000 | $3,000 |
| Frank B. Cooper | E(Inv.—PPI) | 20,000 | 2,000 |
| James D. Cooper | E(Inv.—PPI) | 30,000 | 3,000 |
| James D. Cooper | E(Inv.—PPI) | 20,000 | 2,000 |
| Charles F. Cooper | E(Inv.—PPI) | 30,000 | 3,000 |
| Charles F. Cooper | E(Inv.—PPI) | 20,000 | 2,000 |
| Charles F. Cooper | E(CAP.—PPI) | 110,000 | 11,000 |
| Charles F. Cooper | E(CAP.—PPI) | 2,000 | 200 |
| Virginia P. Cooper | CAP.—PPI | 40,000 | 4,000 |
| Virginia P. Cooper | CAP.—PPI | 8,000 | 800 |

On January 1, 1946, Mutual, Series 81544, deeded 100 lots in Valencia Hills and various other unimproved properties to Perpetual, Series 145. Mutual, Series 81544, had acquired the property from Virgina P. Cooper on August 21, 1944.

On December 31, 1945, Perpetual, Series 144, accepted certain assets, liabilities, and share accounts from Mutual, Series 81544.

On December 31, 1945, Perpetual had assets and liabilities in various series of shares as follows:

ASSETS

| | |
|---|---|
| Cash | $57,413.31 |
| Notes and accounts receivable (loans) | 212,373.71 |
| Land and other real estate | 192,791.79 |
| Total assets | 462,578.81 |

LIABILITIES

| | |
|---|---|
| Member shares | 162,916.96 |
| Total liabilities | 162,916.96 |

NET WORTH

| | |
|---|---|
| Reserves | $296,150.13 |
| Undivided profits | 3,511.72 |
| | 299,661.85 |
| Total liabilities and net worth | 462,578.81 |

On December 10, 1945, Charles, president of Perpetual, purchased 67.64 acres of land from the F. S. Royster Guano Company for $25,000, part of which was borrowed from Perpetual. Charles transferred the property at cost to Perpetual, Series 144, on January 1, 1946, for which he was given share credits. Charles intended to transfer the property to Perpetual for share credits at the time he purchased it.

On January 1, 1946, Perpetual acquired by deed from Mutual one unimproved lot on the southeast corner of the intersection of Calhoun and Gregg Streets, another improved lot on the southwest corner of Calhoun and Laurens Streets, 12 lots in the Victory Gardens subdivision, and certain property in Valencia Hills, Columbia, South Carolina.

From March 7, 1946, to June 10, 1946, Perpetual, Series 145, made 5 sales of parcels of land from the Royster property for a total consideration of $35,500. The remainder of the land was developed into the Oakhurst subdivision and sold to Biltmore Homes, Inc. (controlled by the Cooper family), on September 17, 1946, for $48,950.

On June 10, 1946, Perpetual acquired unimproved lot 13, block C, on Lake Shore Drive from William P. Cooper, Jr.

On June 18, 1946, Perpetual acquired unimproved lot 4, block D, Valencia Hills subdivision from Virginia P. Cooper.

On August 23, 1946, Perpetual acquired unimproved building lot 7, block P, of Valencia Hills subdivision from Mutual.

Mutual deeded a piece of property on Calhoun Street to Perpetual on January 1, 1946. On July 26, 1946, Perpetual sold this property to Maribruce, Inc. for a consideration of $32,000, of which $5,000 was paid by a purchase money note and mortgage.

On January 29, 1946, Perpetual sold an unimproved lot on the corner of Forest Drive and Pinehurst Road to two individuals for $1,400 cash.

On July 10, 1946, Perpetual sold one unimproved lot on Rosemont Street to an individual for $750 cash.

On February 21, 1946, Perpetual acquired lots 15, 23, 24, 25, and 26 in Forest Lake Estates from Forest Land Company. Lot 15 was sold on August 31, 1946, for $9,250, all of which was paid by a purchase money note and mortgage. Lots 24 and 26, together with newly constructed houses, were also sold during 1946. Forest Land

Company was a company whose stock was owned by John Hughes Cooper prior to his death in 1945.

On January 29, 1946, Perpetual acquired one unimproved building lot in Jackson Heights. This lot was sold to an individual on February 26, 1946.

On February 19, 1946, Perpetual acquired lot I, block C, Forest Drive.

On September 17, 1946, Perpetual sold 41 lots in Valencia Hills, 90 lots in Oakhurst, 37 lots in Forest Dale, 10 lots in Victory Gardens, 3 lots in Claireview Terrace, 2 lots in Forest Lake Estates, 2 lots on Calhoun Street, and some other property to Biltmore Homes, Inc., for $104,700 on credit. Biltmore Homes, Inc. was incorporated on September 17, 1946, and was wholly owned and controlled by Frank, James, and Charles Cooper.

On or about June 8, 1946, Perpetual placed building restrictions and convenants running with the land on 39 lots in Valencia Hills.

During the year 1946 Perpetual constructed houses in the Valencia Hills subdivision. During 1946 Perpetual sold approximately 150 newly constructed houses and lots in Valencia Hills. In each case, the grantee executed a purchase money note and mortgage for substantially all of the purchase price. Perpetual sold the majority of the mortgages soon after receipt. All the work connected with the sale of the houses was performed by Perpetual's employees.

During February and March 1946, Perpetual sold 32 unimproved lots in the Forest Dale subdivision with the consideration being received by Perpetual in cash at or about the date of each sale.

On August 31, 1946, Perpetual, Series 146, sold the 331 acres mentioned above, less certain building lots, to an individual for $25,000. This property had been acquired by Perpetual, Series 144, from Small Farms Company on December 31, 1944, transferred to Mutual, Series 63045, on June 30, 1945, and reconveyed to Perpetual, Series 146, on December 31, 1945.

On June 30, 1946, Perpetual, Series 146, declared a so-called stock dividend of 2 shares for 1 on Capital Prepaid Installment shares. This included the share account of William P. Cooper which, after giving effect to the dividend, had a maturity value of $160,000 on which there was then a total credit of $18,186.08.

On December 31, 1946, Perpetual declared another so-called stock dividend of 6 shares for 1 share on all Capital Prepaid Installment shares.

As a result of the December 31, 1946, "stock" dividend declaration, Virginia P. Cooper's share accounts with Perpetual (having credit balances totaling $4,800) received dividend credits of $24,000. Virginia withdrew the balance of $24,725.40 from one of the accounts

in 1948. Of the amount, $20,000 represented dividends credited to the account on December 31, 1946.

As a result of the December 31, 1946, "stock" dividend declaration, William P. Cooper's share accounts with Perpetual (having credit balances of $18,186.08) received additional dividend credits of $90,930.40. After this credit the account had a balance of $109,116.48. Perpetual repurchased the account in full on February 17, 1949, for $117,445.65. This amount included the aforesaid dividend of $90,930.40 as well as like dividends which had been made to the account previously.

On December 31, 1946, Perpetual, Series 145, approved new subscriptions for Capital Prepaid Installment shares by Frank B., James D., and Charles F. Cooper. Each was allowed to subscribe to such shares with maturity values not exceeding $100,000 divided into not more than 10 share accounts. Perpetual agreed to carry the required 10 per cent initial payment for each of them as a share loan, provided that the 10 per cent be paid in full on or before December 20, 1947. Perpetual never did this for anyone else. Frank, James, and Charles each subscribed to 10 shares with a maturity value of $90,000, $91,000, and $100,000, respectively. Each subscription was made on January 1, 1947, with the 10 per cent initial payment being made on December 12, 1947.

On April 10, 1947, Biltmore executed 90 first mortgages to Perpetual on 90 lots and improvements on Oakhurst totaling $472,900. Thereafter, Biltmore built houses on the lots which were sold for $542,051. The purchasers assumed Biltmore's first mortgages (held by Perpetual) totaling $472,900, gave second mortgages to Perpetual totaling $68,713.50, and paid $437.50 in cash. Perpetual sold all of the 90 first mortgages between September 3, 1947, and April 28, 1948, for approximately their face value. Perpetual gave Biltmore $33,838.45 for the second mortgages having a face value of $68,713.50.

On April 14, 1947, Perpetual sold 1 improved lot on Edgewood Street to an individual for $4,500, all of which was paid by a purchase money note and mortgage.

On December 31, 1947, Perpetual declared a so-called stock dividend of 6 shares for 1 share on all Capital Prepaid Installment shares. The aforesaid accounts acquired by Frank, James, and Charles on January 1, 1947, were credited with the respective amounts of $45,000, $50,000, and $50,000. Five of the Capital Prepaid Installment share accounts of each of them was then converted to Investment Prepaid Installment share accounts.

On October 18, 1948, Frank withdrew the balance of $18,000 in Prepaid Installment accounts of which amount $15,000 represented so-called stock dividends credited to the account on December 31, 1947. Likewise, on October 17, 1948, James withdrew the balance

of $30,000 in Prepaid Installment accounts, of which amount $25,000 represented "stock" dividends credited to the account on December 31, 1947.

During 1948, Perpetual financed Forest Lake Apartments, Inc., in the construction of 39 duplex houses. Separate mortgages of $11,800 each were given to Perpetual on each of the houses. Members of the Cooper family organized and held the stock of Forest Lake Apartments, Inc.

During 1948 Perpetual financed the construction of 100 small homes in a subdivision known as Alta Vista. The homes were constructed as rental property.

On October 28, 1948, Perpetual, Series 145, and Cooper Agency entered into an agreement with Alta Vista Building Company and Simon Faust whereby they were given the option to finance 288 homes in Alta Vista and 512 homes in another section of Richland County. Perpetual and Cooper Agency were also given the exclusive right to handle all sales and all rentals of the houses when completed. The agreement also provided that Perpetual and Cooper Agency were entitled to one-half of the profits after construction costs. Perpetual loaned Alta Vista Building Company and Simon Faust (jointly) the sums of $85,000 on January 19, 1949, and $75,000 on February 26, 1949. Thereafter, on October 28, 1949, Perpetual loaned an additional $75,000 to Simon Faust and other officers of Alta Vista Building Company to finance the beginning of the Alta Vista project.

On February 1, 1949, Alta Vista Building Company executed 100 first mortgages to Perpetual.

On September 19, 1949, Perpetual acquired 4 lots in Forest Acres subdivision and 11 lots in Valencia Hills from Forest Land Company.

On February 15, 1950, Perpetual received 288 lots from Alta Vista Building Company in satisfaction of certain unpaid obligations of Alta Vista Building Company to Perpetual. Individual residences had been erected on 100 of these lots and on the date of the transfer some of these 100 residences were rented.

During the year 1950, Perpetual made 45 individual sales of houses and lots from the property transferred from Alta Vista Building Company. Forty-two of these houses were sold for $5,825 which was made up of $5,600 for house and lot, and $225 for closing cost. Three of these houses were sold at $6,050, $6,750, and $6,340, respectively. One hundred per cent "GI loans" were made by Perpetual on all of these 45 houses.

Perpetual loaned the following amounts to Garden Water Company, Columbia, South Carolina, to use in extending its waterlines:

| Date | Amount |
|---|---|
| Oct. 28, 1949 _____ | $17,000 |
| Nov. 23, 1949 _____ | 9,000 |
| Feb. 18, 1950 _____ | 6,000 |

In 1949 Perpetual loaned $30,000 to Forest Land Company, Inc., to construct a shopping center.

Perpetual loaned Charles considerable sums of money. Charles and his wife owed Perpetual $11,014, $26,048.57, $38,681.88, and $109,507.18 at the end of the years 1945, 1946, 1947, and 1948, respectively. Part of the money was borrowed to finance the construction of a terminal for Cooper Motor Lines.

Perpetual loaned Charles, Frank, and James Cooper money to purchase the Holloway Farm on or about October 14, 1948. They deeded the land to Cooper Agency on September 16, 1949, who developed it into the Greenview subdivision. Perpetual financed Cooper Agency in constructing about 198 houses in Greenview. Cooper Agency was incorporated on September 7, 1949. Frank, Charles, James, and Edwin Cooper were its sole officers and owned all of its stock in equal parts.

On September 10, 1949, Cooper Agency executed a note and mortgage in the amount of $68,150 to Perpetual. The note and mortgage represented a consolidation of the liabilities of $23,650 to Mutual, $36,000 to Perpetual, and $8,500 for the purchase of an interest in the Springfield Depository.

At various times during the years 1945 to 1951, inclusive, Perpetual made loans to the following companies:

Mutual Savings and Loan Company.
Mutual Properties, Inc.
Economy Builders.
Garden Water Company.
Forest Lake Apartments, Inc.
Forest Land Company, Inc.
Small Farms Company.
Cooper Agency.
Alta Vista Building Company.

On September 14, 1951, a mortgage of $135,000 was recorded on the public records of Richland County by Perpetual with Economy Builders as mortgagor.

On December 18, 1951, a mortgage of $60,000 was recorded on the public records of Richland County by Perpetual. The mortgagor was Mutual Properties, Inc. At that time Virginia and Charles Cooper owned 999 shares of the 1,000 shares of outstanding stock of Mutual Properties, Inc. Charles executed the mortgage for the corporation as its president.

Perpetual usually charged 6 per cent interest on home loans that were not insured or guaranteed by the Veterans' Administration or

the Federal Housing Administration. If the loan was a GI or FHA-insured loan, the interest rate was 4 per cent to 4½ per cent, with some loans being as high as 5 per cent. Construction loans to builders were generally at 7 per cent interest.

Article IV, section 1 of the bylaws, set forth in the passbook, issued by Perpetual states, in part, that all holders of share accounts in any series of the association and "all borrowers therefrom shall be deemed and held to be members thereof. * * *"

A borrower who gave Perpetual a mortgage which was insured or guaranteed by the Veterans' Administration or the Federal Housing Administration did not participate in the earnings of Perpetual. If Perpetual sold a mortgage, the mortgagor did not thereafter participate in Perpetual's earnings.

The total maturity value of share accounts held by Charles, Virginia, Frank, James, and William P. Cooper was as high as $751,000 at times during the years 1945 to 1951, inclusive.

On November 12, 1952, the respondent retroactively withdrew his ruling of October 21, 1946, which had held that the petitioner was entitled to exemption from Federal income tax under section 101(4) of the Code of 1939 and held that the petitioner was not exempt from taxation for years beginning with 1944. The petitioner was informed that it was required to file Federal income tax returns on Form 1020 beginning with the year 1944.

During the years 1945 to 1951, inclusive, Perpetual was operated under the supervision and control of the South Carolina Board of Bank Control.

During the years 1945 to 1951, inclusive, there were 934 real estate mortgages payable to Perpetual Building and Loan Association recorded on the records of the clerk of court for Richland County, South Carolina. This number does not include security given for any share loans or any other loans made by Perpetual which were secured wholly by security other than a real estate mortgage recorded in Richland County.

During the fiscal years ended August 31, 1950 and 1951, Cooper Agency (controlled by members of the Cooper family) paid or accrued on its books to the credit of its officers and employees salaries, fees, commissions, and payroll taxes in the respective amounts of $22,113.69 and $33,445.61.

In the statutory notice involved herein, respondent allowed Perpetual deductions for salary and payroll taxes for the calendar years 1950 and 1951 in the respective amounts of $16,591.46 and $18,848.07 as allocable from Cooper Agency under section 45 of the 1939 Code.

By an amendment to the answer in the instant proceeding, respondent has alleged in the alternative that if the Court in the case of Cooper Agency, Docket No. 64669 (33 T.C. 709), holds that

Cooper Agency is entitled to the deduction of all or a part of the salary and payroll expense which respondent disallowed to Cooper Agency for the fiscal years ended August 31, 1950, and August 31, 1951, and allocated to Perpetual, Perpetual will not be entitled to those contra deductions for salary and payroll expenses allowed in the statutory notice in the instant case as expenses allocable from Cooper Agency.

OPINION.

I. *Exempt Status.*

The petitioner contends that it was exempt from taxation during the years 1945 to 1951, inclusive, under section 101(4) of the 1939 Code (here applicable as it existed prior to amendment by the Revenue Act of 1951).[1] (The amendment in the 1951 Act applies only to taxable years beginning after December 31, 1951. See sec. 313(b) and 313(j) of the 1951 Act.)

Respondent, in opposition, maintains that petitioner lacks several of the essential characteristics of a legitimate building and loan association, namely, mutuality among the shareholders and borrowers and the accumulation of funds primarily for making loans to "members" to promote individual home ownership. Essentially, it is respondent's position that the activities of Perpetual in acquiring and selling real estate and in building and selling houses were outside of the type of business in which a tax-exempt building and loan association was permitted to engage; that these activities resulted in substantial profit to those who neither borrowed nor furnished the capital used in the business of the taxpayer; that the profits inured largely to the benefit of a small (family) group precisely as in the case of an ordinary corporation trading in money or merchandise; and that petitioner is, therefore, in the same class as ordinary business corporations engaged in commercial enterprises, and as such, under the statute, stands in no better position for the purpose of Federal taxation.

Respondent's determination is, of course, presumptively correct and the burden of proof is upon petitioner to show that it is entitled to the exemption. *Fidelity Savings & Loan Co.*, 44 B.T.A. 471, 478 (1941).

Neither the revenue act here applicable nor prior revenue laws define what is meant by a building and loan association. The pivotal inquiry, therefore, is what scope is to be given to the words as con-

---

[1] The following organizations shall be exempt from taxation under this chapter—

   *       *       *       *       *       *       *

    (4) Domestic building and loan associations substantially all the business of which is confined to making loans to members; and cooperative banks without capital stock organized and operated for mutual purposes and without profit;

templated by section 101(4), *supra*. For a comprehensive history of the legislative history of section 101(4), *supra*, see *Employees Industrial Loan Association, Inc.*, 27 B.T.A. (1933) ; *Johnstown Building & Loan Association*, 6 B.T.A. 463 (1927).

Looking to the language of the statute, to qualify for exemption under section 101(4), *supra*, the association must satisfy two requirements: (1) It must come within the classification of a "domestic building and loan association" and (2) "substantially all of its business must be confined to making loans to members."

In *United States* v. *Loan & Bldg. Co.*, 278 U.S. 55 (1929), affirming 66 Ct. Cl. 500 (1927), the Supreme Court interpreted the phrase "domestic building and loan associations" as meaning organizations that are recognized as such under the law of the State of incorporation provided that there has not been a "gross misuse of the name."

The Code of South Carolina does not define the term building and loan association. However, in *Griffin* v. *White*, 189 S.E. 127, 131 (S.C. 1936), the Supreme Court of South Carolina held that, in general, a building and loan association is a mutual enterprise with all members being under the same rules and sharing profits and losses equally.

In its rudimentary form, a building and loan association exists for the purpose of encouraging its members, investors, and borrowers to acquire habits of frugality; to provide its members a secure and profitable investment for their savings; and to provide a fund, through periodic subscriptions by its members, for loans to build or to buy homes for their own occupancy or use. *Hopkins Savings Assn.* v. *Cleary*, 296 U.S. 315 (1935) ; *Louisville Gas Co.* v. *Coleman*, 277 U.S. 32 (1928).

Mutuality among members is an essential attribute of a building and loan association, and the exemption statute under consideration recognizes this in limiting the exemption to building and loan associations, substantially all of the business of which is confined to making loans to members. Other factors of mutuality relate to the control and management of the business and its assets, and, in a more fundamental sense, to the opportunity and means it affords the members for saving and borrowing for home owning. Unlike a banking institution which operates primarily for the benefit of its investing stockholders, a building and loan association is, fundamentally, intended to be conducted for the benefit of its borrowing members as well as nonborrowers. This includes the principle that borrowing members are to receive substantially proportionate treatment with respect to profits as nonborrowers. See *Oul Building & Loan Association*, 6 B.T.A. 1196, 1203 (1927) ; Sundheim, Law of Building and Loan Associations, p. 10 (3d ed.).

In addition to the indispensable attribute of mutuality, since section 101(4) requires that substantially all of the loans must have been made to "members" of the building and loan association, it is essential to ascertain whether the borrowers from petitioner during the years involved were "members" within the intendment of the statute. Since building and loan associations are organized on many diverse plans, what constitutes membership is not a matter for generalization, but is a question of fact to be determined in the light of all the circumstances in the particular case. An implied element of membership is a mutual interest in the affairs of the association. Membership is not implied, however, from the mere fact that a loan is obtained from the association. *Fidelity Savings & Loan Co., supra* at 479; *Wytheville Building & Land Fund Association*, 36 B.T.A. 786 (1937).

We have no doubt that building and loan associations may make loans to nonmembers. *United States* v. *Loan & Bldg. Co., supra.* This, however, does not avoid the requirement that, in order to qualify for exemption under section 101(4), substantially all of the association's business must be confined to making loans to members. Moreover, whatever may be said as to propriety from the perspective of a building and loan association, the business of building and construction, and of the purchase subdivision, and sale of real estate, is not a business of making loans to members.

Likewise, while variations from the norm or original plan of the loan association are no doubt permissible, we think it clear that loans to contractors for building and construction purposes, or for the construction of commercial buildings, do not constitute the business of making loans to members within the ambit of section 101(4), *supra*, under the circumstances presented by this record. Cf. I.T. 1961, III–1 C.B. 259; I.T. 2283, V–1 C.B. 293; G.C.M. 1231, VI–1 C.B. 82. While it is difficult to draw a precise line as to how far a building and loan association may engage in extraneous activities without losing its basic character, it seems clear that "when it ceases to be substantially mutual and adopts as its chief business dealing for profit with the general public by the methods of an ordinary savings bank, it is no longer a building association, entitled to be exempted from income taxation under the statute in question." *Lilley Building & Loan Co.* v. *Miller*, 280 F. 143, 146 (S.D. Ohio, 1922), affirmed per curiam 285 F. 1020 (C.A. 6, 1923), certiorari denied 262 U.S. 754.

Viewing the facts before us in the light of the foregoing principles, it is our opinion that Perpetual was not a building and loan association, substantially all of whose business was confined to making loans to its members, but acted to a large extent, as an alter ego of Charles F. Cooper and his family group.

The evidence shows that during the taxable years 1945 to 1951, inclusive, Perpetual was under the complete domination and control of Charles and members of his family. It is clear that we are dealing here with a corporation, the purpose of which, to a large extent, was to benefit, directly or indirectly, private family interest. During said years Perpetual occupied offices together with or adjacent to those of three other corporations which were either owned or controlled by the Cooper family and these corporations had extensive real estate dealings with petitioner.

Investment of the association's funds in real estate in which the Coopers had an interest was frequent. As detailed more fully in our Findings of Fact, in 1944, Perpetual began acquiring realty most of which came from members of the Cooper family or corporations in which they had some financial interest. This property was set up in separate series of accounts in which virtually all of the shareholders were members of the Cooper family. Thus, on December 30, 1944, Perpetual's Series 144 was authorized. Its assets consisted of land, most of which had been acquired from a Cooper corporation known as Small Farms Company. The valuation placed on said land included anticipated profits of $48,138. No share accounts except those of members of the Cooper family were included in this series. Thereafter, the entire assets, liabilities, and share accounts were transferred from Perpetual's Series 144 to Mutual Savings and Loan Company, Series 63045. Mutual was also dominated by the Coopers. On December 31, 1945, Perpetual created Series 146 and accepted for it all of the assets, liabilities, and share accounts that Series 144 had transferred to Mutual's Series No. 63045 on June 30, 1945, as set out above. Charles was given shares in this series in return for conveying 67 acres of land which he had acquired from the Royster Guano Company with money he had borrowed from Perpetual. Charles had acquired the land with the intention of transferring it to Perpetual.

Also, on December 31, 1945, Perpetual created Series 145 and accepted from Mutual's Series No. 81544 certain assets, together with a corresponding amount of other liabilities and share accounts. The share accounts consisted only of prepaid investment share accounts belonging to members of the Cooper family. Some of the property had previously been acquired by Mutual from the wife of Charles.

During the taxable years involved, Perpetual subdivided and sold the property which it had thus acquired to various individuals and corporations. There were numerous transactions, many of which were clearly outside the permissive business activity which circumscribes the activities of the tax-exempt building and loan association. Perpetual constructed houses on some 150 lots in Valencia Hills which

it sold during the year 1946. All of the work connected with said sales was performed by petitioner's employees. In addition, Perpetual financed the construction of a shopping center; loaned money to a firm to extend its waterlines; financed Charles in the construction of a terminal for Cooper Motor Lines; financed contractors and corporations in the construction of houses which were being built for rental or sale.

Whether engaged speculatively or conservatively in these activities, it is generally beyond the powers of even a commercial bank to engage in the business of buying, developing, and selling real estate beyond the extent to which real estate transactions are necessary to protect itself against loss on loans made by it.[2] See *National Home Building & Loan Ass'n.* v. *Home Sav. Bank,* 181 Ill. 35, 54 N.E. 619 (1899).

As already stated, Perpetual was extensively used by members of the Cooper family in financing personal ventures of their own and their corporations. In 1945 it loaned Charles the money to purchase the Royster (later known as Oakhurst) property which was then deeded by him to Perpetual for shares. In 1946, Perpetual sold various lots to Biltmore Homes, Inc., for $104,700 on credit. Biltmore Homes, Inc., was owned and controlled by Charles, James, and Frank. Most of the property consisted of a portion of the Oakhurst property which Charles had purchased with Perpetual's money and later deeded to Perpetual for shares. Also, in 1948, Perpetual financed Forest Lake Apartments, Inc. (owned and controlled by the Cooper family), in constructing 39 duplex houses. In 1948, Perpetual and Cooper Agency were also given the exclusive right to handle all sales and rentals of about 800 houses to be built by Alta Vista Building Company. In addition, Perpetual and Cooper Agency were to receive one-half of the profits after construction costs of this project.

Likewise, in 1948, Perpetual loaned Charles, James, and Frank funds to purchase a farm. They deeded the land to Cooper Agency (a corporation owned and controlled by Charles, James, Frank, and Edwin Cooper). Cooper Agency developed the land into a subdivision with Perpetual financing the construction of 198 houses during the year 1949.

Later, in 1949, Perpetual loaned $30,000 to Forest Land Company, which was also a Cooper family corporation. During 1951 Perpetual loaned $60,000 to Mutual Properties, Inc., a corporation in which Charles and his wife owned all the stock.

---

[2] With respect to Perpetual's own construction activities, Charles testified as follows: (Tr. p. 59)

"Q: Perpetual acquired property and subdivided it and built homes and sold them. They also backed other people for doing the same thing during the years 1945 through 1951.

Court: Is that true?

Witness: In some cases, yes, sir."

Charles and his wife, Virginia, personally owed Perpetual $11,014, $26,048.57, $38,681.88, and $109,507.18 at the end of the years 1945, 1946, 1947, and 1948, respectively. Part of the money had been borrowed to finance the construction of a terminal for Cooper Motor Lines.

On December 31, 1946, Perpetual allowed Charles, Frank, and James to subscribe to Capital Prepaid Installment shares in Series 145 on credit. It never allowed such preferential treatment to anyone else. On December 31, 1947, said accounts received dividend credits of $50,000, $45,000, and $50,000, respectively. Charles' wife received dividends of $24,000 on share accounts on which only $4,800 had been paid. Similarly, dividends in the amount of $115,172.39 were credited to William's account in which he had paid $2,273.26.

Obviously, there was no mutuality as to profits among the shareholders of Perpetual as that term is defined for purposes of section 101(4), *supra*. The Cooper family manipulated the operations of Perpetual in a manner so that all sizable profits went for their benefit rather than for the benefit of all of the shareholders. Perpetual credited dividends to the accounts of the Cooper family at various times during the years involved in amounts ranging from 200 to 600 per cent of their original investment representing a portion of the association's earnings. It is clear that Perpetual, operating primarily for the benefit of the Coopers and their personal ventures, was not such a building and loan association as was contemplated by the statute.

By so holding, we do not wish to imply that under other circumstances loans to corporate officers of a building and loan association or to their family to promote individual home ownership or for commercial projects subsidiary to this basic purpose would not be permissive. Cf. G.C.M. 1231, VI–1 C.B. 82. Unquestionably, Perpetual made loans to individuals and corporations who were not related to the Coopers and for ventures in which the Coopers had no personal interest. However, petitioner, who has the burden of proof, has failed to show that all of its mortgage borrowers were "members" during the years involved or that substantially all of its business was confined to making loans to members within the intendment of the statute.

It is petitioner's position that all of its loans were to "members" because its bylaws automatically made every borrower a member. We do not agree. In *Fidelity Savings & Loan Co.*, *supra*, where the taxpayer argued that since its charter limited loans to members, then ipso facto, all borrowers were members, we said (p. 479):

Membership in such association [building and loan] is a formal matter. The general rule is that the act of becoming a member implies a contract intelligently entered into. 9 C.J. 932; 12 C.J.S. 419; *Sundheim, supra*, pp. 23, 24. As in the case of a stockholder, a member (the same thing) enjoys rights and liabilities. The members of a building and loan association, whether or

not they are borrowers, have a mutual interest in its affairs, and, sharing alike in its profits, must assist alike in bearing its losses. Such relationship is to be distinguished from the debtor-creditor relationship which exists between such an association and borrowers who are not members. "It [a building and loan association] is wholly unlike a savings society where the borrower is not a member or otherwise interested in its business. Having no voice in the management nor interest in the earnings of the society, the borrower and it sustain the simple relation of debtor and creditor." *Eversmann* v. *Schmitt*, 53 Ohio St. 174; 41 N.E. 139, 142. ·

Membership is not implied from the mere fact that a loan is obtained from a building and loan association, *Manor* v. *Aldrich*, 126 Fed. 934; even where loans are restricted to members, *Kadish* v. *Garden City Equitable Loan & Building Association*, 151, Ill. 531; 38 N.E. 236; and even where stock is issued, if the borrower had no desire or intention of becoming a member and the stock was issued under a misunderstanding, and where the loan contract itself creates no other relation than that of borrower and lender. The fact that a borrower executes a mortgage on his property to secure a loan does not make him a member. *Wright* v. *Lynskey* (Court of Civil Appeals, Texas), 285 S.W. 655. * * *

In our view, if a corporation does not substantially meet the generally recognized criteria of a bona fide building and loan association, it is not such a tax exempt association as is contemplated by the statute, regardless of what name it may have or how it may be designated or classified by the State statute under which it was organized. Assuming, *arguendo*, however, that Perpetual is a qualified building and loan association under State law, i.e., that there has not been a "gross misuse of the name," it is clear that substantially all of its business was not confined to making loans to members as required by the statute. *United States* v. *Loan & Bldg. Co., supra.*

Petitioner, in support of its position, relies upon *United States* v. *Loan & Bldg. Co., supra, Guaranty Building & Loan Co. of Marion, Indiana*, 27 B.T.A. 754 (1933), and *Permanent Loan and Savings Association*, 2 B.T.A. 132 (1925), all of which we have carefully considered. We find them distinguishable on the facts, and not here controlling. We think that a detailed discussion of these cases would merely serve needlessly to protract this opinion.

In the light of the foregoing, and the record as a whole, we hold that petitioner was not entitled to exemption from income and excess profits taxes under section 101(4), *supra*, for the taxable years in question.

### Issue 2. Statute of Limitations.

On November 12, 1952, respondent notified Perpetual that it was not entitled to exemption from taxes under section 101(4) since it had not been operating as a true building and loan association. Respondent further advised petitioner on that date that it was required to file Federal income tax returns on Form 1120, beginning with the taxable year 1944. Petitioner never filed the required returns.

Petitioner contends that the assessment and collection of the alleged deficiencies for each of the taxable years involved is barred by sections 275 of the 1939 Code [3] and 302(b) of the Revenue Act of 1950.[4] Petitioner concedes that it did not file any corporation or excess profits returns (Forms 1120 and 1121) for any of the years in question. It is petitioner's position that the Forms 990 started the running of the statutory period for assessment and collection of its taxes for the years involved so that the notice of deficiency mailed to it on September 17, 1956, more than 3 years later, was too late.

Respondent avers that the statute of limitations has not expired under section 275 for any of the years because no returns (Forms 1120 and 1121) were filed. It is respondent's position that the Forms 990 which were filed by Perpetual did not start the running of the statute of limitations because they were merely information returns. Respondent relies on *Automobile Club of Michigan* v. *Commissioner*, 353 U.S. 180 (1957), rehearing denied 353 U.S. 989 (1957), and *F. E. McGillick Co.*, 30 T.C. 1130, 1150 (1958), affd. 278 F. 2d 643 (1960), insofar as here material.

We find no suggestion in section 54(f), *supra*, that returns (Form 990) filed in supposed compliance therewith will start the running of the statute of limitations on the assessment and collection of any taxes. In *Automobile Club of Michigan* v. *Commissioner, supra*, the Supreme Court held that "the Form 990 returns are merely information returns in furtherance of a congressional program to secure information useful in a determination whether legislation should be enacted to subject to taxation certain tax-exempt corporations competing with taxable corporations. Those returns lack the data necessary for the computation and assessment of deficiencies and are not, therefore, tax returns within the contemplation of § 275(2)."

---

[3] SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION.

Except as provided in section 276—

(a) GENERAL RULE.—The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.

[4] Revenue Act of 1950:

SEC. 302. EXEMPTION OF CERTAIN ORGANIZATIONS FOR PAST YEARS.

(b) PERIOD OF LIMITATIONS.—In the case of an organization which would otherwise be exempt under section 101 of the Internal Revenue Code were it not carrying on a trade or business for profit, the filing of the information return required by section 54 (f) of the Internal Revenue Code (relating to returns by tax-exempt organizations) for any taxable year beginning prior to January 1, 1951, shall be deemed to be the filing of a return for the purpose of section 275 of the Internal Revenue Code (relating to period of limitation upon assessment and collection). In the case of such an organization which was, by the provisions of section 54 (f) of the Internal Revenue Code, specifically not required to file such information return, for the purposes of the preceding sentence a return shall be deemed to have been filed at the time when such return should have been filed had it been so required. The provisions of this subsection shall not apply to a taxable year of such an organization with respect to which, prior to September 20, 1950, (1) any amount of tax was assessed or paid, or (2) a notice of deficiency under section 272 of the Internal Revenue Code was sent to the taxpayer.

Petitioner is not aided by the provisions of section 302(b), *supra*. Analysis of said section, in the light of its legislative history, shows that information returns required under section 54(f) are to be considered as returns for purposes of section 275, *supra*, only in the cases of those organizations which would otherwise be exempt under section 101 were they not "carrying on a trade or business for profit." S. Rept. No. 2375, 81st Cong., 2d Sess., 1950–2 C.B. 483, 567; H. Rept. No. 3124, 81st Cong., 2d Sess., 1950–2 C.B. 580, 590. Both congressional reports, it appears, were concerned with the retroactive taxability of so-called "feeder corporations" of organizations which had been exempt under paragraphs (1), (6), or (7) of section 101 but who lost their exempt status because they were carrying on a "trade or business for profit" and it was not intended to cover organizations claiming exemption under subsection (4). See *John Danz*, 18 T.C. 454, 465, (1952), affirmed sub nom. *John Danz Charitable Tr.* v. *Commissioner*, 231 F. 2d 673 (C.A. 9, 1956). Unlike the organizations enumerated in paragraphs (1), (6), or (7) of section 101, which are required to operate without pecuniary profit to its members, it is anticipated that a building and loan association will make some profit since it is in business, among other things, for profit. Perpetual's exemption under section 101(4) was revoked because its activities allegedly did not meet the prerequisites of the applicable exemption statute, and not because it was "carrying on a trade or business for profit" within the purview of section 302(b), *supra*.

In passing, we note that section 6501(g)(2) of the Code of 1954 provides that if a taxpayer determines in good faith that it is an exempt organization for a taxable year and files a return under section 6033 of the 1954 Code (the counterpart of section 54(f), *supra*, relating to the annual information return of exempt organizations), such return shall be deemed the return of the corporation for purposes of the running of the period of limitation. See sec. 301.6501(g)(2), Procedure and Administration Regs. This provision, however, had no counterpart in prior law and is not to be applied retroactively. See 10 Mertens, Law of Federal Income Taxation, sec. 57.33.

In view of the foregoing, we sustain respondent on this issue.

## Issue 3. Additions to Tax.

Respondent has added 25 per cent to the deficiencies determined for the taxable years of 1945 to 1951, inclusive, pursuant to section 291(a) of the 1939 Code, on the ground that petitioner failed to make and file the return required by law for each year within the time prescribed by law. Said addition to the tax is applicable unless the taxpayer shows that its failure to file the required return was

due to reasonable cause and was not due to willful neglect. *Robert A. Henningsen*, 26 T.C. 528, 536 (1956), affd. 243 F. 2d 954 (C.A. 4, 1957); *Employees Industrial Loan Association, Inc.*, 27 B.T.A. 945 (1933).

As stated above, on November 12, 1952, respondent notified petitioner by letter that its tax-exempt status had been revoked retroactively, and that it was required to file Federal income tax returns on Forms 1120 beginning with the taxable year 1944. Petitioner never filed a corporation income tax or excess profits tax return for any of the taxable years involved, although it did file information returns on Forms 990 for each of said years.

We have held in Issue 2, *supra*, that the information forms required by section 54(f), which Perpetual filed during the taxable years involved, were not such returns as would start the running of the statutory period for assessment and collection of its taxes for those years and that petitioner did not come within the purview of section 302(b), *supra*.

Assuming that, in view of respondent's ruling letter of October 21, 1946, stating that petitioner would not be required to file income tax returns unless it changed the character of its organization, the purpose for which it was organized, or its method of operation, was a reasonable cause for failure to file prior to November 12, 1952, and that failure to file up to that time was not due to willful neglect, despite the activities of petitioner described in our findings and discussed under part I of our Opinion, *supra*, we do not think that petitioner may successfully urge such letter as a basis for failure to file within a reasonable time after respondent's letter of November 12, 1952. The letter of November 12, 1952, expressly held that petitioner was not entitled to exemption beginning with the year 1944, and expressly notified petitioner that it was required to file Federal income tax returns beginning with that year. Petitioner failed to file such returns within a reasonable time after November 12, 1952, or, in fact, at any time thereafter. We find no evidence in the record to show that such failure to file was due to reasonable cause, and we, accordingly, sustain respondent's determination on this point. See *John Danz, supra* at 466.

### Issue 4. Salary and Payroll Deductions.

Respondent allowed the petitioner deductions for salary and payroll expenses for the taxable years 1950 and 1951 which had been claimed by Cooper Agency on its Federal income tax returns, but disallowed by respondent in his statutory notice in that case. (See *Cooper Agency*, 33 T.C. 709.) Said amounts were allowed in the

instant case because the respondent determined that they were allocable to Perpetual's operations under section 45 of the 1939 Code [5] in order to clearly reflect the income of the two businesses.

In the case of *Cooper Agency, supra,* we allowed as a deduction a part of the salary and payroll expenses which had been disallowed by respondent in his statutory notice in that case.

Respondent allowed said salary and payroll expenses for the years 1950 and 1951 as deductions in the instant case solely in implementation of section 45 as applicable to petitioner and *Cooper Agency.* Respondent claimed orally at the trial, and later by amendment to answer, that to the extent that this Court might allow such deductions in *Cooper Agency, supra,* and to the extent that such allowances may be duplications of the allowance in the statutory notice in the instant case, such duplication of deductions must be avoided and, therefore, to the extent thereof, the items in question should be disallowed in the instant case.

Petitioner has presented no argument to the contrary in the instant case, and we take it that it does not disagree with the principle urged by respondent.

Under the circumstances, it is unnecessary for us to enter into an elaborate discussion of the issue or to detail the relationship of control and dominion of the Cooper group with respect to the petitioner and *Cooper Agency.* Suffice it to say that upon the record before us the implementation of section 45 requires us to eliminate any such duplication by disallowance of the deductions in the instant case to the extent of such duplications.

The amounts in question may readily be stipulated by the parties in the Rule 50 computation in the instant case. In addition, the Rule 50 computation will give effect to any unused loss carryback of petitioner from 1952 to 1951.

We, of course, judicially notice our proceedings in *Cooper Agency, supra,* to the extent necessary for the implementation of section 45. See *Ambassador Hotel Co. of Los Angeles,* 32 T.C. 208, 216 (1959), affd. 280 F. 2d 303 (C.A. 9, 1960).

*Decision will be entered under Rule 50.*

---

[5] SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.