COOPER AGENCY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 64669. Filed January 26, 1960.

*Charles F. Cooper, Esq.*, for the petitioner.
*George W. Calvert, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined deficiencies in income tax of petitioner as follows:

| Period | Income tax |
|---|---|
| Taxable period Sept. 11, 1949, to Aug. 31, 1950 | $5,746.88 |
| Fiscal year ended Aug. 31, 1951 | 20,154.82 |

The issues presented for our consideration are (1) whether petitioner is entitled to deductions for interest in the taxable years 1950 and 1951, in excess of $11,583.80 and $9,856.19, respectively, (2) whether petitioner is entitled to deductions for salary and payroll taxes in the years 1950 and 1951, in excess of $7,371.23 and $10,348.54, respectively, and (3) whether petitioner is entitled to a net operating loss carryover from the year 1950 to 1951. The last issue will depend on the resolution of issues (1) and (2) hereinabove.

### FINDINGS OF FACT.

Cooper Agency (hereinafter sometimes called petitioner) was incorporated under the laws of the State of South Carolina on September 7, 1949, and was authorized to engage in the development, rental, and sale of real estate, and the general insurance business. Petitioner's office is located in Columbia, South Carolina.

Petitioner filed income tax returns for the fiscal years ended August 31, 1950, and August 31, 1951, with the then collector of internal revenue for the district of South Carolina. Said returns were filed on an accrual basis.

Corporate officers of Cooper Agency from its incorporation through the taxable year 1951 were as follows:

Frank B. Cooper, president.
Charles F. Cooper, vice president.
Edwin H. Cooper, vice president.
James D. Cooper, secretary and treasurer.

Said officers are brothers.

During the taxable years 1950 and 1951, Cooper Agency had authorized an outstanding capital stock consisting of 4,500 shares with a par value of $1 per share. One-fourth of the stock was owned by each said officer.

Petitioner occupied offices together with Perpetual Building and Loan Association, hereinafter sometimes called Perpetual. Perpetual was chartered under the laws of the State of South Carolina on May 30, 1914. Under ruling dated October 21, 1946, Perpetual had been

granted exemption from filing Federal income tax returns, the ruling also stating that, in the opinion of the office of the Deputy Commissioner of Internal Revenue, based upon the evidence presented, Perpetual was exempt from income tax under the provision of section 101(4) of the Code of 1939. Charles was the president of Perpetual, Frank was its vice president, and James was its treasurer. They had been holding these offices since June 1945, and together with Rosa M. Romanstine, secretary, they constituted the board of directors of Perpetual.

Petitioner purchased property known as the Holloway Farm from Charles, Frank, and James Cooper on September 16, 1949. They had purchased the property on October 14, 1948, with money they had borrowed from Perpetual. Charles, who was a lawyer, checked the title to the property when he and his brothers purchased it.

Petitioner's principal activity during the taxable years involved was the construction and sale of 198 small dwellings in a subdivision known as Greenview. Greenview was developed out of the aforesaid Holloway Farm. The houses were sold for approximately $3,700 each.

In connection with the construction of the 198 Greenview houses, Frank, on behalf of petitioner, and Charles, on behalf of Perpetual, orally agreed that Perpetual would "lend" to and Cooper Agency would borrow from it $600,000. At the same time Frank and Charles agreed that the individual loans on the sale of the houses to be built would be handled through Perpetual. No attempt was made by Cooper Agency to borrow the construction money from any other source.

Perpetual entered $600,000 on its books as "Loans in Process" to Cooper Agency on March 25, 1950. On that date, the first advance of funds to Cooper Agency was made in the amount of $5,000. Thereafter, other advances were made.

Petitioner sold the Greenview homes promptly upon completion. The proceeds of the sales were paid over by petitioner to Perpetual. This was required by Perpetual as a part of the loan agreement negotiated by Frank and Charles. Perpetual charged interest at the rate of 7 per cent per annum on the entire loan of $600,000 from the time of the inception of the arrangement.

The dates and amounts of cash advanced by Perpetual to Cooper Agency on the Greenview loan, the dates and amounts of payment of proceeds of sales by Cooper Agency to Perpetual, and the net balances due Perpetual as shown on the records of Perpetual were as follows:

| Date | Repayments by Cooper Agency | Cash advanced | Balance | Date | Repayments by Cooper Agency | Cash advanced | Balance |
|---|---|---|---|---|---|---|---|
| Mar. 25, 1950 | | $5,000 | $5,000 | Nov. 17, 1950 | | $15,000 | $63,500 |
| Apr. 1, 1950 | | 8,000 | 13,000 | Nov. 24, 1950 | | 25,000 | 88,500 |
| Apr. 7, 1950 | | 10,000 | 23,000 | Dec. 7, 1950 | | 25,000 | 113,500 |
| Apr. 11, 1950 | | 2,000 | 25,000 | Dec. 12, 1950 | 90,000 | | 23,500 |
| Apr. 15, 1950 | | 13,000 | 38,000 | Dec. 20, 1950 | | 10,000 | 33,500 |
| Apr. 22, 1950 | | 10,000 | 48,000 | Jan. 3, 1951 | | 10,000 | 43,500 |
| Apr. 29, 1950 | | 7,500 | 55,500 | Jan. 4, 1951 | | 10,000 | 53,500 |
| May 7, 1950 | | 6,000 | 61,500 | Jan. 10, 1951 | | 17,000 | 70,500 |
| May 13, 1950 | | 9,000 | 70,500 | Jan. 15, 1951 | | 10,000 | 80,500 |
| May 20, 1950 | | 8,000 | 78,500 | Jan. 19, 1951 | | 15,000 | 95,500 |
| May 26, 1950 | | 15,000 | 93,500 | Jan. 26, 1951 | | 18,000 | 113,500 |
| June 6, 1950 | | 10,000 | 103,500 | Jan. 31, 1951 | 39,600 | | 73,900 |
| June 23, 1950 | $32,400 | | 71,100 | Feb. 2, 1951 | | 17,000 | 90,900 |
| June 24, 1950 | | 21,000 | 92,100 | Feb. 9, 1951 | | 15,000 | 105,900 |
| July 1, 1950 | | 14,000 | 106,100 | Feb. 13, 1951 | | 4,000 | 109,900 |
| July 15, 1950 | | 15,000 | 121,100 | Feb. 16, 1951 | | 15,000 | 124,900 |
| July 17, 1950 | 28,800 | | 92,300 | Feb. 24, 1951 | | 5,000 | 129,900 |
| July 27, 1950 | | 25,000 | 117,300 | Mar. 2, 1951 | | 25,000 | 154,900 |
| July 31, 1950 | 86,400 | | 30,900 | Mar. 23, 1951 | | 10,000 | 164,900 |
| Aug. 10, 1950 | | 25,000 | 55,900 | Mar. 30, 1951 | | 10,000 | |
| Aug. 23, 1950 | | 5,000 | 60,900 | Mar. 30, 1951 | 151,200 | | 23,700 |
| Aug. 31, 1950 | | 13,000 | 73,900 | Apr. 13, 1951 | | 20,000 | 43,700 |
| Sept. 1, 1950 | 68,400 | | 5,500 | Apr. 30, 1951 | 86,400 | | (42,700) |
| Sept. 9, 1950 | | 13,000 | 18,500 | May 8, 1951 | | 15,000 | (27,700) |
| Sept. 16, 1950 | | 25,000 | 43,500 | June 4, 1951 | 46,800 | | (74,500) |
| Sept. 18, 1950 | | 14,000 | 57,500 | June 25, 1951 | 10,800 | | (85,300) |
| Oct. 1, 1950 | | 5,000 | 62,500 | June 30, 1951 | | 5,000 | (80,300) |
| Oct. 4, 1950 | 10,800 | | 51,700 | July 5, 1951 | | 5,000 | (75,300) |
| Oct. 11, 1950 | | 15,000 | 66,700 | July 19, 1951 | | 15,000 | (60,300) |
| Oct. 25, 1950 | | 10,000 | 76,700 | Aug. 16, 1951 | | 5,000 | (55,300) |
| Oct. 27, 1950 | | 13,000 | 89,700 | Aug. 21, 1951 | | 2,000 | (53,300) |
| Nov. 4, 1950 | | 10,000 | 99,700 | Aug. 27, 1951 | | 3,000 | (50,300) |
| Nov. 6, 1950 | 61,200 | | 38,500 | Aug. 31, 1951 | | 5,000 | (45,300) |
| Nov. 10, 1950 | | 10,000 | 48,500 | | | | |

Petitioner never had a net balance of over $165,000 of Perpetual's money at any time in connection with the loan to construct the Greenview subdivision.

Interest due to Perpetual by Cooper Agency, computed at 7 per cent on the outstanding balances shown on the records of Perpetual on funds advanced to Cooper Agency for the construction of the Greenview subdivision was $2,141.67 for 1950 and $3,564.79 for 1951.

On its Federal income tax returns for the years 1950 and 1951, petitioner deducted $15,458.42 and $22,794.88, respectively, as interest payments to Perpetual on the Greenview construction loans. Respondent allowed deductions for interest on the loans from Perpetual in the respective amounts of $2,369.85 and $3,078.58 for these years which he computed at 7 per cent on the outstanding balance of funds advanced to Cooper Agency.

During the years 1949 through 1951, inclusive, Perpetual was engaged in taking deposits, making and servicing loans, and acquiring and selling real estate.

Charles, Frank, and James were in complete charge of the day-by-day operations of both Cooper Agency and Perpetual. They did not have any definite time to work for either Cooper Agency or Perpetual, but did what was necessary for each.

During the period September 11, 1949, to August 31, 1950, Cooper Agency paid salaries to its officers totaling $18,000 and salaries to other employees totaling $3,920. The amount of $18,000 included salaries of $6,000 each to Frank and James, and a fee of $6,000 to Charles for legal services in fiscal 1951.

During the period September 1, 1950, to August 31, 1951, Cooper Agency paid salaries to its officers totaling $26,400 and salaries to other employees totaling $6,832.50. Of these amounts, Frank and James each received a salary of $12,000. Charles received nothing.

During the years 1949, 1950, and 1951, Perpetual paid salaries to its officers and directors and other employees in amounts as follows:

| Year | Officers and directors | Other employees |
|------|------------------------|-----------------|
| 1949 | $42,000 | $2,500.00 |
| 1950 | 8,000 | 640.00 |
| 1951 | None | 5,662.15 |

The services rendered to petitioner by Frank B. Cooper during the periods in question were substantially as follows: Served as president of petitioner, was active in getting the construction project under way in 1950, negotiated the contract with the builder, supervised construction of houses and saw to it that they were in conformity with the building contract, helped James D. to some extent in arranging to qualify prospective buyers, solicited insurance, supervised construction of shopping center, and aided James D. in getting tenants for the stores at the center.

In addition to working with Frank B., to some extent, James D. served as secretary-treasurer. His most substantial services were in respect of sales of houses, about one-third of which were sold in fiscal 1950, and two-thirds in fiscal 1951. No real estate agents were employed. There were ample prospective customers, but many of them were not of the class or type acceptable to the Veterans' Administration or qualified creditwise for a certificate of eligibility. James D. consumed a large amount of time in interviews with prospective purchasers, investigating credits, facilitating qualifications of satisfactory purchasers, servicing loans, and paperwork in connection therewith. While James D. had some assistance from Frank B., the activity in relation to and responsibility for sales largely devolved upon James.

Charles F. Cooper served as vice president. His substantial services in 1950 consisted of legal work for the company. His most important service was in making a complete search and abstract of the title to the land of the Greenview project in connection with the loan from Perpetual to petitioner. Other legal services consisted of preparing restrictions at the direction of the Veterans' Administration, handling right-of-way problems, procuring permission of a

railroad company to run waterlines under the railroad, and drafting the contract negotiated with the builder Rayburn.

Petitioner paid a salary of $25 a week to Sadie Worthy, employed in the office at Greenview, and $40 a week to Mary L. Laird, employed in the office in town, for their services rendered to petitioner in the years in question.

The salaries paid to Frank B. and James D. Cooper for the years 1950 and 1951 were reasonable for services rendered to petitioner. The compensation paid to Charles F. Cooper for services to petitioner in 1950 was reasonable to the extent of $3,000, and excessive to the extent of $3,000.

The salaries paid to the two office employees named above, one at Greenview, and the other in town, were reasonable for services rendered to petitioner for the years in question.

OPINION.

## I. *Interest Deductions.*

Petitioner contends that all interest accrued during the taxable years 1950 and 1951 was properly deductible under section 23(b) of the Code of 1939.[1] Petitioner claimed deductions for interest on its corporate tax returns for said years in the respective amounts of $28,844.67 and $30,469.62. In the petition filed herein petitioner alleges that it is entitled to interest deductions in said years in the aggregate amount of $31,074.79 and $32,295.72, respectively.

Respondent, in opposition, contends that petitioner is not entitled to deductions for interest in the years 1950 and 1951 in excess of $11,583.80 and $9,856.19, respectively. The amounts which the respondent disallowed as proper deductions for interest consist of three separate items in each year. The largest part of the total disallowed consists of the amounts of $13,088.57 and $19,716.30, which purported to be interest on a loan by Perpetual of $600,000 in connection with petitioner's construction of houses in the Greenview subdivision. Although petitioner, on brief, contested the entire adjustment for interest claimed, it did not present any evidence on items other than the one with respect to Greenview. In the absence of any affirmative evidence, it is clear that petitioner has failed to meet its burden of proof in respect thereof. We, therefore, affirm respondent's determination as to interest items in issue unrelated to Greenview.

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

(b) INTEREST.—All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer). the interest upon which is wholly exempt from the taxes imposed by this chapter.

As to the disputed interest (Greenview), respondent, in his statutory notice, determined that petitioner's liability for interest to Perpetual for funds used in constructing the Greenview subdivision did not exceed the amounts of $2,369.85 and $3,078.58, respectively, for the 2 years involved. These amounts reflected interest computed at 7 per cent on the unpaid balance of construction funds actually advanced by Perpetual to the petitioner. The remainder of the payments were held to be "gratuitous payments" for which no deductions were allowable. Alternatively, respondent urges that the excess interest deduction ($10,718.72 and $16,637.72, respectively, for the 2 years involved), claimed in respect to the Greenview project, represented a diversion of a portion of petitioner's gross income to a corporation (Perpetual) controlled by the same interests as the petitioner, and that a reallocation under section 45 of the Code of 1939 [2] was necessary in order to clearly reflect the petitioner's taxable income.

Section 23(b), *supra*, allows deductions in computing net income for all interest paid or accrued within a taxable year on indebtedness, subject to an exception not material herein. The words "interest on indebtedness" are understood in the business world to mean "compensation for the use or forebearance of money," and that is the meaning which is to be attributed to them in applying the statute here involved. An obligation is not necessarily an "indebtedness," nor are all carrying charges "interest" within the meaning of section 23(b). *Deputy v. Du Pont*, 308 U.S. 488 (1940); *Old Colony R. Co. v. Commissioner*, 284 U.S. 552 (1932); *Gilman v. Commissioner*, 53 F. 2d 47 (1931), affirming 18 B.T.A. 1277 (1930).

Respondent's primary contention raises the recurrent juridical problem of form versus substance. It is axiomatic that a taxpayer has the right to mold a transaction having a legitimate business purpose in such manner as to minimize the incidence of taxation, for no taxpayer is obligated to pay more tax than the law demands of him. *Gregory v. Helvering*, 293 U.S. 465 (1935). A taxpayer, seeking to avoid taxation, may, however, attempt to disguise a transaction and make it appear to be something which in reality it is not. When the Court is confronted with this type of problem, it will ignore the form the transaction has assumed, declaring it, in its entirety or in part, to be a sham or lacking in economic reality, and

---

[2] SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances, between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

will ascertain the tax impact based upon the substantive nature of the transaction. See *Eli Goodstein*, 30 T.C. 1178, 1190 (1958), affd. 267 F. 2d 127 (C.A. 1, 1959). "To hold otherwise would be to exalt artifice above reality, and to deprive the statutory provisions in question of all serious purpose." *Gregory* v. *Helvering*, *supra*. In *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945), the Supreme Court stated (p. 334):

The incidence of taxation depends upon the substance of a transaction. * * * To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

In *1432 Broadway Corporation*, 4 T.C. 1158 (1945), affd. 160 F. 2d 885 (C.A. 2, 1947), we had the question of the deductibility of interest before us and in the course of our opinion we said (pp. 1164–1165):

The debentures are in approved legal form, and, if their legal attributes alone were determinative of the character of the interest accruals, there would be little room for doubt that they were the indebtedness they purport to be. Cf. *Clyde Bacon, Inc.*, 4 T.C. 1107. But, for tax purposes, their conformity to legal forms is not conclusive. Although a taxpayer has the right to cast his transactions in such form as he chooses, and the form he chooses will generally be respected, the Government is not required to acquiesce in the taxpayer's election of form as necessarily indicating the character of the transaction upon which his tax is to be determined. "The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statutes." *Higgins* v. *Smith*, 308 U.S. 473. * * *

We believe that the principles stated in the foregoing cases are applicable here where there is no doubt that a transaction has taken place, but the basic question is whether the characterization or extent of the purported indebtedness in issue and interest thereon accords with substantial economic reality. Here, the purported Greenview loan of $600,000 and interest rate thereon was highly in excess of the reasonable financial needs of the business venture in question that raises the tax question, and for practical purposes less than one-third of the purported loan was drawn or used. While in form the aggregate amount of $38,253.30 paid by petitioner to Perpetual, the lending institution, purports to constitute interest within the meaning of section 23(b), *supra*, the fact that $435,000 of the total "loan" of $600,000 was never used supports a reasonable inference that such excess was a sham, lacking in reality and substance. This view is supported by the fact that the transaction was not at arm's length, that the transaction was between entities controlled by the same family interests, that the excess "borrowed" could have been "paid off" at any time by bookkeeping entries under the control of the same

individuals, and that the entity which received the so-called interest (Perpetual) was believed to be a building association exempt under then existing law from Federal income taxes.

The $600,000 was set up as "loans in process" by Perpetual on its books but it did not physically advance the money to petitioner. Perpetual doled out small sums to the petitioner as construction on the subdivision progressed. There is no evidence that the money "loaned" was at all times unqualifiedly subject to petitioner's demands. As petitioner finished a house it was promptly sold and the sales price was used to repay funds advanced by Perpetual. This was done in accordance with the original agreement or understanding reached by Frank B. (on behalf of petitioner) and Charles F. (on behalf of Perpetual).

The fact that the so-called interest in the amount of 7 per cent per annum on the entire purported loan of $600,000 was labeled as "interest" cannot render it deductible for income tax purposes to the extent that it did not represent interest on a realistic "indebtedness" within the ambit of the statute. *Autenreith* v. *Commissioner*, 115 F. 2d 856 (C.A. 3, 1940), affirming 41 B.T.A. 319 (1940). There is no acceptable evidence of what might reasonably have been borrowed under the circumstances by entities operating at arm's length, but it is clear that the amount would not have been anything like $600,000, and it is equally apparent that as progress was made, houses built and sold, the proceeds paid on account, and the need for funds greatly reduced, steps would have been taken to reduce the principal of the loan and correspondingly the interest thereon. This would have been within the control of the group which controlled the affairs of both entities. It would also have been some evidence of good faith and practical dealing.

Transactions among members of a family, as here, calculated to reallocate or reduce income are subject to careful scrutiny. In cases of this character the absence of any direct evidence of sham is not surprising. The circumstantial evidence, discussed *supra*, however, is too convincing to be disregarded.

As we said in *Charles L. Huisking & Co.*, 4 T.C. 595, 600 (1945): "Section 23(b) of the Internal Revenue Code is designed to permit of the deduction of genuine interest on a genuine indebtedness." Essentially, interest, to be deductible under section 23(b), must have economic reality and not be a mere device or contrivance to avoid taxation. Except to the extent to which we allow interest deductions *infra*, we conclude that the so-called interest in this case does not meet that test.

In the light of the foregoing discussion, we allow an interest deduction for the fiscal year 1950 in the amount of $2,369.85 (as allowed by respondent) and for the fiscal year 1951 in the amount of $3,564.79

(which has been calculated from the documentary evidence of advances in the record and does not appear to be disputed by respondent).

We do not wish to be understood as saying that we would under different circumstances approve disallowance of interest paid on actual loans merely because the loans turned out to be in excess of actual requirements of the borrower. We fully realize that in construction loans, as in many types of business transactions, the borrower must arrange for ample funds which will assure him of a sufficient amount to carry through his project. In arm's-length transactions there would ordinarily be no question about the propriety of the interest expense. Even among related parties, although subject to close scrutiny, the evidence may well demonstrate a bona fide and reasonable need for borrowing in an amount which turns out to be more than required for the undertaking in question. Here, the disparity is so excessive as to be completely unrealistic, and there is no evidence to show what amount of loan would have been reasonable. Upon the record, we have no recourse other than to approve, in substance, the disallowance of interest in excess of that paid or accrued on money actually advanced by Perpetual.

## II. *Salaries.*

In his statutory notice, respondent determined that petitioner is not entitled to deductions for salaries and payroll taxes in the taxable years 1950 and 1951 in excess of $7,371.23 and $10,348.54, respectively. Respondent avers that two-thirds of the amount claimed on petitioner's returns for said expenses ($14,742.46 and $20,697.07), are not allowable as deductions, and that this portion of the salaries and payroll taxes are applicable to the operations of Perpetual under section 45, *supra*, in order to clearly reflect the income of the two businesses.

Section 45, *supra*, authorizes the respondent to allocate gross income between businesses which are owned or controlled directly or indirectly by the same interests if he determines that such action is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of the businesses.

The issue, in the main, revolves around the services of the three Cooper brothers (Frank B., James D., and Charles F.) referred to in our findings, and in our discussion under issue I. The facts with respect to their services are set forth in our findings, and need not be repeated here.

The project was a substantial one, and demanded experienced and capable handling. It likewise required time-consuming efforts and attention.

Frank B. was evidently the responsible "outside" man upon whom devolved the problems relating to building and construction, including planning and procuring physical results. We think the record amply supports the fact that salaries paid to him of $6,000 and $12,000 in the fiscal years 1950 and 1951 were reasonable for his services rendered to petitioner, and we allow the full amount thereof as deductions to petitioner.

The substantial activities of James D. centered on sales. There were no real estate agents or commissions paid. His salary of $6,000 and $12,000 in the respective years in question was less than real estate commissions would have been. While little if any soliciting was required, the job of selecting and qualifying purchasers was an arduous one, and was highly significant in the success of the project. We again hold that the amounts paid to him were reasonable for his services to petitioner and we allow them in full.

The situation with respect to Charles F. is somewhat different. His services were in the main that of a lawyer. His most significant services were in fully searching and abstracting the title to the Greenview property on which the project developed, although he rendered other services referred to in our findings. He was paid $6,000 in fiscal 1950, and nothing in 1951. In attempting to establish the value of his services, he relied substantially on the custom in the area of paying 1 per cent of the amount of the loan involved in connection with which a complete search and abstract of title is made. The loan here significant was the so-called $600,000 loan discussed in issue I of our Opinion. We made it clear in our discussion that the loan could not be deemed realistic in the amount of $600,000 and a valuation of his services based on 1 per cent of that amount is likewise unrealistic. Upon careful consideration of the record, including that relating to his other legal services, we think he has justified compensation for fiscal 1950 in the amount of $3,000, and the remaining $3,000 is disallowed as a deduction.

All of the services of the three brothers discussed herein were rendered to petitioner. We think it clear on the record (and we so hold) that to the extent we have allowed compensation to them as reasonable, allocation to Perpetual was not necessary to prevent evasion of taxes or clearly to reflect income of petitioner within the meaning of section 45.

In the years in question, respondent disallowed two-thirds of the compensation (and payroll taxes attributable thereto) paid to others than the three brothers (and Daisy H. Cooper to be discussed *infra*), and allocated the amount so disallowed to Perpetual under section 45. As to the office employees named above, one at Greenview and one in town, we have found as a fact that their compensation was reasonable

for services rendered to petitioner, and hold that there was no occasion to allocate any portion thereof to Perpetual under section 45.

For completeness on the subject of salaries, we add that the disallowance of the salary of Daisy H. Cooper for fiscal 1951 was not put in issue by petitioner, and no evidence was offered in relation thereto. Respondent is, accordingly, sustained with respect to such disallowance.

As to the compensation of any employees not already named above, no evidence was offered and respondent's partial disallowance relating to them is sustained because of petitioner's failure to meet the burden of proof of error.

### III. *Loss Carryover.*

Petitioner claims that it is entitled to a net operating loss carryover from the taxable year 1950 to the year 1951. Both sides agree that the resolution of the issue of the amount, if any, of such a carryover is a matter of calculation depending upon our conclusions under issues I and II of our Opinion. Accordingly, we leave the problem, together with uncontested issues, to computation under Rule 50.

*Decision will be entered under Rule 50.*