Dixo Company, Inc. v. Commissioner. Estate of Sol Schapiro, Deceased, Antranig Aslanian, Executor, and Claire Schapiro v. Commissioner.
Dixo Co. v. Commissioner
Docket Nos. 2236-66, 2237-66.
United States Tax Court
T.C. Memo 1968-133; 1968 Tax Ct. Memo LEXIS 161; 27 T.C.M. (CCH) 644; T.C.M. (RIA) 68133; June 27, 1968, Filed Paul Friedman, 1450 Broadway, New York, N. Y., for the petitioners. Leo A. Burgoyne, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined deficiencies in Federal income taxes of petitioners, Dixo Company, Inc., and Estate of Sol Schapiro, *162 Deceased, Antranig Aslanian, Executor, and Claire Schapiro, as follows: [1] *13 Dixo Company, Inc.
Taxable year ended
Deficiency
March 31, 1962
$ 1,730.91
March 31, 1963
5,038.23
March 31, 1964
29,816.57 *13 Estate of Sol Schapiro, Deceased, Etc., and Claire Schapiro
Taxable year ended
Deficiency
December 31, 1961
$ 902.43
December 31, 1962
1,069.55
December 31, 1963
1,257.99 After various concessions by the parties, the issues remaining for our consideration are: (1) whether certain amounts paid by petitioner Dixo Company, Inc., were excessive and unreasonable and thus not properly deductible as compensation; (2) whether petitioner Dixo Company, Inc., may deduct as ordinary and necessary business expenses certain expenditures for purported selling expenses by Sol Schapiro, a stockholder-employee; and (3) whether petitioners Estate of Sol Schapiro, Deceased, and his wife, Claire, realized taxable income as a result of payments made to Sol by Dixo Company, Inc., to reimburse him for such purported selling expenses. Findings of Fact Some of the facts have been *163 stipulated and are found accordingly. Those facts and the exhibits attached to the stipulation are incorporated herein by this reference. Issue No. 1 Corporate Deduction for Compensation Petitioner Dixo Company, Inc. (hereinafter referred to as "Dixo"), is a New Jersey corporation, incorporated in 1954 and having its principal place of business in Rochelle Park, New Jersey, at the time the petition herein was filed. Dixo filed timely Federal corporate income tax returns for its taxable years ended March 31, 1962, 1963, and 1964 with the district director of internal revenue, Newark, New Jersey. Dixo manufactures a line of detergents, sizings, water repellents, spot-removing fluids, and other chemical specialties for the dry-cleaning industry. In addition, the company is a jobber of various other drycleaning supplies such as "Perclene" perchlorethylene, manufactured by E. I. DuPont de Nemours & Company. At all times relevant herein, the issued and outstanding stock of Dixo was held by Sol Schapiro (10 shares), his wife, Claire (10 shares), and their son Jerome (1 share). During the years here involved, Sol was president and treasurer of the company, Jerome, vice president, *164 and Claire, secretary. Prior to and including the years in issue, Sol Schapiro was the chief executive and administrative officer of Dixo. He had had many years experience in the business. A good deal of his time was spent maintaining important contacts with customers. Sol typically worked an average of 60 hours per week. Two or three mornings a week he would visit customers before opening up the plant at 8 o'clock. Because he closed the plant each night, he rarely left before 6 o'clock. On Thursdays, he would spend most of the day "on the road" as a 646 salesman. Sol also performed substantial administrative duties for Dixo including the spending of the better part of each Saturday on the books and records. Sol received no overtime compensation for his work. Since the inception of Dixo, he had not taken any significant vacation time. He was a member of the American Oil Chemists Society and the American Society for the Advancement of Science. Jerome Schapiro was in charge of Dixo manufacturing operations during the years here relevant. He was a graduate chemical engineer from Syracuse University and had received postgraduate training at Columbia University. He served as project *165 engineer in the Propellents Branch, United States Naval Air Rocket Station, Lake Denmark, New Jersey. In October 1952, he was appointed as a reserve officer in the United States Air Force and in December 1952 was assigned to duty as Safety Officer, Plant Operations Branch, Chemical and Radiological Laboratories, Army Chemical Center, serving in this position through 1953. During the years in issue, Jerome was a member of the American Chemical Society, the American Institute of Chemical Engineers, the American Standards Association, and the American Association of Textile Chemists and Colorists, serving on the latter's research committee on dry cleaning. [2]
*166 Since becoming associated with Dixo on a full-time basis in 1954, Jerome has been responsible for the creation and discovery of several new products, the development of a laboratory testing system, and the designing of all advertising formats and material for the publicizing of Dixo products. During the years in issue, he worked an average of 70 hours per week. His workday would often start as early as 4 or 5 in the morning and/or late at night. Such schedule was required in order to meet the peculiar hours during which certain customers (i.e., wholesale cleaners) did the bulk of their work. Jerome was primarily responsible for the largest customers of Dixo and, in addition to engaging in selling activities, he would conduct surveys and prepare detailed progress reports on the operations of such customers' dry-cleaning departments. Throughout his employment at Dixo, Jerome has received no overtime pay and has never taken a vacation for an extended period of more than one week. Stephen B. Sobel is a son-in-law of Sol Schapiro. He graduated with an excellent record from Columbia Law School in 1956 and, immediately prior to becoming employed by Dixo in July 1960, was associated with *167 a New York City law firm. At the time of his employment by Dixo, he was earning a salary of $7,800 per year with such firm plus discretionary year-end bonuses (which rarely were less than two weeks' salary) and the firm was billing clients for his services at the rate of $20 per hour. He decided to work for Dixo because he foresaw great potential in the business and hoped that, as his services became more valuable through experience and on-the-job training, he would be able to share in the financial benefits of such potential. Stephen handled all legal matters arising in connection with Dixo. During the years in question, he spent approximately 25 hours per month on such legal matters. He was also familiar with some of the technical aspects of the business - including the different laboratory procedures employed in the testing of solvents. On occasions when Jerome was unable to do so, Stephen would call on customers and, to a limited degree, supplied certain technical services at customers' plants. If necessary, in emergencies he would also fill in for other company salesmen. Any knowledge that Stephen had with regard to the technical and day-to-day operation of Dixo was acquired *168 from either Sol or Jerome through on-the-job training. During the years in question, Stephen worked an average of 60 to 70 hours per week, received no overtime compensation, and took no vacation time. No attempt was made to allocate his compensation between legal and other services rendered. Prior to its incorporation, the predecessor company of Dixo was operated since 1940 as a partnership by Sol Schapiro and his brother, David. Gross sales and net income as reported on the partnership returns for 647 the taxable years 1951, 1952, and 1953 were as follows: Year
Gross sales
Net income
1951
$73,584.18
$12,229.65
1952
66,105.08
10,314.42
1953
86,963.48
12,205.99
Commencing with the year ended March 31, 1955, and for all years subsequent thereto, the gross sales, officers' salaries, and net profit of Dixo were as follows: Year
Gross
Net
March 31
(nearest]
salaries
(loss)
ended
sales
Officers'
profit
1955
$127,249.00
$15,070.00
$ 407.83
1956
141,342.00
19,070.00
652.56
1957
202,811.00
20,930.00
(964.94)
1958
248,119.00
20,280.00
(3,045.01)
Year endedMarch 31
Gross sales(nearest]
Officers'salaries
Net profit(loss)
1959
$280,723.00
$36,300. 00
$ 675.50
1960
308,958.00
42,130.00
1,330.37
1961
329,079.00
42,120.00
(94.68)
1962
379,958.00
47,520.00
(590.31)
1963
459,307.00
58,820.00
(199.06)
1964
548,608.00
95,320.00
(1,397.86)
*169 On its income tax return for the year ended March 31, 1964, Dixo showed an accumulated deficit of $5,209.68. The company has never paid any dividends. Dixo paid and claimed as salaries to Sol Schapiro, Jerome Schapiro, and Stephen Sobel the following amounts for the years indicated: Fiscal year ended March31
Sol Schapiro
JeromeSchapiro
StephenSobel
T otal
1955
$ 8,700
$ 6,370
$ 15,070
1956
11,850
7,220
19,070
1957
13,650
7,280
20,930
1958
13,000
7,280
20,280
1959
21,700
14,600
36,300
1960
25,200
16,930
$ 3,300
45,430
1961
22,600
19,520
7,800
49,920
1962
27,000
20,520
7,800
55,320
1963
28,900
29,920
7,800
66,620
1964
37,400
57,920
24,800
120,120
For the taxable years ended March 31, 1962, 1963, and 1964, Dixo deducted salaries and wages (other than compensation of officers) of $30,386.75, $49,203.02, and $61,928.62, respectively. These amounts included salaries paid to Stephen Sobel, as indicated above. During these same taxable years, contributions in the respective amounts of $1,784.83, $1,784.83, and $1,582.62 were made to the Dixo pension plan on behalf of Jerome Schapiro. No contributions *170 were made to the plan on behalf of Sol Schapiro or Stephen Sobel during any of these years. The compensation policy of Dixo was set by Sol and Jerome and was administered on a calendar year basis. At the beginning of each year, after a review of the financial performance of the past year, they would project that amount which was expected to be available for the payment of salaries during the coming year. At the end of each quarter, Sol and Jerome would go over the accountant's reports in order to determine how much cash was available to meet the projected compensation figures. Weekly compensation payments to a given person would thus sometimes vary within the same calendar and/or fiscal year. In addition, Dixo would at various times make "extra payments" to Sol, Jerome, and Stephen. These payments were intended as compensation for past services which had been rendered at times when sufficient funds allegedly had not been available to allow for full remuneration. No formal entries were made on the Dixo books to reflect any liability for such services, but the payments were entered on the company compensation records when made, as were the estimated withholding taxes related thereto. *171 According to the records of Dixo, the following is the schedule of payments to Sol, Jerome, and Stephen during the years in question: *13
Sol
Jerome
Stephen
Year ended March 31
Per week
"Extra payments"
Per week
"Extra payments"
Per week
"Extra payments"
1962
1st quarter
$ 500
$2,000
$ 260
$6,000
$150
2nd quarter
500
260
150
3rd quarter
500
260
150
4th quarter
150
8 weeks at
500
260
5 weeks at
300
460
1963
1st quarter
$ 300
$ 460
$150
2nd quarter
300
460
150
3rd quarter
460
150
3 weeks at
300
2 weeks at
500
1 week at
700
1 week at
900
6 weeks at
1,200
4th quarter
500
460
150
1964
1st quarter
500
$3,900
460
$6,000
150
$3,000
2nd quarter
500
460
150
3rd quarter
7,500
15,000
7,500
1 week at
500
460
150
1 week at
800
1,060
450
11 weeks at
650
760
300
4th quarter
850
1,160
500 648 In the deficiency notice for the taxable years in issue, respondent disallowed the following amounts claimed as compensation by Dixo: *13 Recipient
Amount disallowed
Year ended
Year ended
Year ended
Recipient
March 31, 1962
March 31, 1963
March 31, 1964
Sol Schapiro
$4,400
$ 6,300
$14,800
Jerome Schapiro
1,000
10,400
38,400
Stephen Sobel
17,000
*172 Issue No. 2 Corporate Deduction for Reimbursed Selling Expenses To the extent applicable, the findings of fact with respect to Issue No. 1 are incorporated herein by reference. Sol Schapiro, Jerome Schapiro, and some of the nonstockholder employees of Dixo submitted weekly statements bearing the caption "Salesman's Expense Report," which statement was a prerequisite to reimbursement for expenses claimed to have been incurred on the company's behalf. Dixo reimbursed its salesmen for various expenditures claimed to have been made by them in performing their duties on behalf of Dixo for such items as meals, auto expenses, tolls, and telephone. Included in the expenses deducted were reimbursements to Sol Schapiro for expenditures of the above described types claimed to have been made by him on behalf of Dixo in the following amounts: Taxable year ended
Amount
March 31, 1962
$2,000.00
March 31, 1963
2,115.88
March 31, 1964
2,063.00
Deductions for selling expenses by Dixo on its corporate income tax returns and the corresponding amounts disallowed by respondent were as follows for the years indicated: Taxable year endedMarch 31
Deducted
Disallowed
1962
$18,401.08
$ 960.00
1963
21,515.23
1,075.88
1964
21,359.50
1,023.00
*173 All of the amounts disallowed by respondent were represented by reimbursements to Sol. The amounts allowed were based on the revenue agent's conclusion that $20 per week was a fair allowance for Sol's expenses, given the facts that Sol was "on the road" only one full day a week and sometimes stopped at clients' businesses on his way to and from home and at lunch time. Issue No. 3 Includability of Reimbursed Expenses in Income of Sol To the extent applicable, the findings of fact with respect to Issues Nos. 1 and 2 are incorporated herein by reference. 649
Antranig Aslanian is the executor of the Estate of Sol Schapiro, to whom letters testamentary have been issued by the Surrogate of the County of Essex, in the State of New Jersey, and Claire Schapiro is the wife of Sol Schapiro. Aslanian resided in Englewood Cliffs, New Jersey, and Claire resided in Newark, New Jersey, at the time the petition in Docket No. 2237-66 was filed. Sol and Claire Schapiro filed timely joint returns for the calendar years 1961, 1962, and 1963 with the district director of internal revenue, Newark, New Jersey. In his deficiency notice for the calendar years 1961, 1962, and 1963, respondent *174 determined that Sol Schapiro received from Dixo and failed to report additional income in the form of reimbursement for expenditures claimed to have been made by him on behalf of Dixo in the respective amounts of $760.00, $1,203.73, and $1,150.25. Ultimate Findings of Fact The following amounts constitute reasonable compensation to Sol, Jerome, and Stephen for the years indicated: Year endedMarch 31
Sol
Jerome
Stephen
1962
$27,000
$20,520
1963
28,900
29,920
1964
30,000
32,500
$12,500
Opinion Issue No. 1 Reasonableness of Compensation The sole question involved in this issue is whether the amounts paid to Sol and Jerome Schapiro and to Stephen Sobel constituted deductible compensation for services under section 162(a)(1). [3] Respondent contends that the payments to Sol and Jerome during all three years in issue and to Stephen Sobel in one of the years were unreasonable and excessive to the extent indicated in the deficiency notice. Petitioner Dixo's major thrust is that respondent has misconceived the nature of the services performed by Sol, Jerome, and Stephen and has failed to consider the purported fact that all three men had been *175 undercompensated for services performed for Dixo in prior years. We agree with petitioner with respect to two of the years in issue; as to the third year, we uphold respondent's determination in part. Whether compensatory payments are reasonable in amount is essentially a question of fact to be determined in light of the particular circumstances of each individual case. Langley Park Apartments, Sec. C, Inc., 44 T.C. 474 (1965), affirmed per curiam 359 F. 2d 427 (C.A. 4, 1966); Huckins Tool and Die, Inc. v. Commissioner, 289 F. 2d 549 (C.A. 7, 1961), affirming *176 a Memorandum Opinion of this Court. The burden of proof as to reasonableness is on the taxpayer. Botany Worsted Mills v. United States, 278 U.S. 282 (1929); Ben Perlmutter, 44 T.C. 382 (1965), affd. 373 F. 2d 45 (C.A. 10, 1967). Each case in this area is sui generis and it would serve no useful purpose to review the various benchmarks which are operative in arriving at a determination on the basis of the particular facts involved. See Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115, 119 (C.A. 6, 1949); J. Warren Leach, 21 T.C. 70, 77 (1953); compare Faucette Co., 17 T.C. 187 (1951). The determination must be directed to an evaluation as to whether, considering the employee's qualifications, the nature, scope, and extent of his work, and the size, complexities, and economics of the business, the payments were in fact made for services rendered or were instead disguised dividends - an evaluation which requires especially close scrutiny in the case of a closely-held family corporation. See Seven Canal Place Corporation v. Commissioner, 332 F. 2d 899, 900 (C.A. 2, 1964). We are mindful *177 that Dixo never paid dividends and that it seems rather consistently to have operated as closely as possible to the break-even point. Moreover, there was no formal authorization for the compensation payments involved herein and the amounts of compensation were to some extent contingent or sporadic. All of these elements are emphasized by respondent as supporting his disallowances. Concededly, they should not be ignored, and, indeed, in the case of a closely-held corporation such as Dixo, they should properly be viewed with considerable suspicion. But clearly they are not determinative. Savko Brothers Company v. Commissioner, 338 F. 2d 956 (C.A. 6, 1964), affirming per 650 curiam a Memorandum Opinion of this Court; Golden Construction Co. v. Commissioner, 228 F. 2d 637 (C.A. 10, 1955), affirming a Memorandum Opinion of this Court; Coe Laboratories, Inc., 34 T.C. 549 (1960); New York Talking Machine Co., et al., 13 B.T.A. 154 (1928); see generally, 4A Mertens, Law of Federal Income Taxation (1966 ed.), secs. 25.68 - 25.81. The critical question is whether the payments were reasonable compensation in light of the services actually *178 rendered. We turn to the particular facts of this case, dealing first with the payments to Sol and Jerome. Both worked long hours without any significant vacation time. Both had long experience in the business and Jerome had additional technical qualifications by virtue of his considerable education and prior training. Both made special contributions to the business - Sol by way of developing and maintaining important contacts and customers, Jerome by virtue of his inventive genius. Both had considerable administrative and managerial talents which they applied with obvious success - during the ten-year period 1955 to 1964, the annual sales increased to $550,000, more than sixfold what they had been in the last full year's operations prior to the formation of Dixo. In short, their services were essential and overwhelmingly important to the business. In a very real sense, they were Messrs. Dixo. When we look at the schedule of their annual compensation, a reasonably clear pattern emerges. Both Sol and Jerome received relatively small salaries during the early years. There was considerable testimony that they had been undercompensated in those years - a pertinent factor in determining *179 the reasonableness of current compensation levels. Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930). Their salary increases during all but the last taxable year before us (fiscal 1964) were modest and relatively closely in line with Dixo's sales, although we recognize that such a parallelism at some point has its limits. During the taxable years before us, there is a degree of regularity in the schedule of weekly salary payments at a level of $500 per week for Sol and $460 per week for Jerome coupled with a recognition through "extra payments" of Jerome's increasingly greater role in Dixo's affairs as the number of years of his service lengthened and as Sol grew older and perhaps relatively less active than Jerome. We note also that, with respect to fiscal 1962, Sol's salary increase was approximately equal to the decreased salary paid to him in fiscal 1961. [4]
*180 Based upon the foregoing, we cannot agree with respondent that the compensation paid to Sol and Jerome should be held to the levels of fiscal 1961. We have found that the amounts of compensation paid to them in fiscal 1962 and 1963 were reasonable and, accordingly, we hold that these amounts are deductible by Dixo under section 162(a)(1). Fiscal 1964, however, presents a different story. Jerome's salary was nearly doubled; Sol's was increased by 30 percent. Although showing a $1,400 loss for the year, company sales had increased approximately 20 percent to the $550,000 mark. Obviously, the company had done well during the year, but, in terms of net profit, its success was somewhat beclouded by the fact that $120,120 had been deducted as compensation to Sol ($37,400), Jerome ($57,920), and Stephen ($24,800) - an amount far in excess of deductions taken for the same item in any prior year. On the record before us, we are unable to find that degree of increased service by Sol and Jerome which would support a finding that the payments to them were reasonable. Nor can we say that the large salary increases in this year were wholly attributable to undercompensation in the past. While *181 we were willing to recognize this element in fiscal 1962 and 1963, we did so only in the face of much smaller total salary payments to the two men. We were furnished practically no evidence with respect to the measure, as distinguished from the fact, of undercompensation. Mere intention to compensate for past services alone is not enough. The question still remains - were the payments reasonable in light of the past services for which compensation had allegedly not been adequate? Doing the best we can on the record before us, we have found that the payments in fiscal 1964 of $30,000 to Sol and $32,500 to Jerome (in addition to the payment on the latter's behalf to the Dixo 651 pension plan) constituted reasonable compensation and we accordingly hold that these amounts are deductible by Dixo under section 162(a)(1). We deal separately with Stephen Sobel, the son-in-law, taken into the business in 1960 and paid at a weekly rate of $150 ($7,800 per year) until fiscal 1964, during which year his total salary - including "extra payments" of $10,500 - rose to $24,800. Respondent has disallowed $17,000 of this amount as excessive and unreasonable compensation. By training, Stephen *182 was a lawyer. At the time he became associated with Dixo, he had engaged in private practice for about two years but had no proven qualifications or experience in the dry-cleaning field. We are satisfied that Sol and Jerome intended to train him in the actual business operations of the company and, at the same time, make use of his legal talents on businessrelated matters. Moreover, accepting Stephen's own testimony, we know that he devoted approximately 25 hours per month to such legal matters and - as did Sol and Jerome - worked a total of 60 or 70 hours per week. But our information is scant as to the precise nature of his nonlegal duties and the level of his competence during the years in question. Any sales activities which he engaged in were apparently on a fill-in basis only; as far as we can ascertain, he had no customers for which he was primarily responsible. Nor are we convinced that Stephen was undercompensated to any significant degree in prior years. Certainly, we cannot value his services at Dixo by what he would have been making had he chosen to remain with the law firm, particularly in view of the fact that only a relatively small portion of his time at Dixo was spent *183 on legal matters. Nor is the time charge by the law firm for Stephen's services a valid criterion of the value of these services, since such charge obviously includes an allowance for overhead expenses. On balance, however, we are willing to recognize that a person with Stephen's obviously above average intelligence and abilities would, after three or four years, certainly become increasingly more valuable to a business - albeit that he had little or no experience in such business at the time he began his employment. Thus, considering all the circumstances, we have found that $12,500 paid to Stephen in fiscal 1964 qualifies as reasonable compensation and is properly deductible by Dixo under section 162 (a)(1). Cf. Cooper Agency, 33 T.C. 709, 719 (1960), affirmed per curiam on other issues 291 F. 2d 831 (C.A. 4, 1961). Issue No. 2 Corporate Deduction for Reimbursement of Expenses Incurred by Sol On its returns for the taxable years involved herein, Dixo took substantial deductions for selling expenses. Included in these deductions were amounts paid to Sol Schapiro to reimburse him for expenditures for meals, auto expenses, tolls, and telephone, purportedly *184 made by him in connection with the performance of his duties on behalf of Dixo. Respondent's agent allowed the deductions for these amounts to the extent of $20 per week and disallowed the balance. Petitioner Dixo seems to suggest that the action of respondent's agent in applying the rule of Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930), was in violation of section 274 and therefore arbitrary. Aside from the fact that section 274 applies only to two of the three fiscal years before us, we fail to see how petitioner Dixo can complain about the advantage it derived from respondent's generosity in using the Cohan rule. Other than some general testimony as to Sol's selling activities and some weekly expense reports submitted by Sol, the record is devoid of any evidence to support the claimed deductions. Obviously, the mere recording of amounts on an expense statement is not proof of actual expenditure nor of business purpose. To be sure, Dixo operated under somewhat of a handicap at trial because Sol was deceased and therefore could not testify. While Jerome obviously could not have testified in detail as to all of the items of claimed expense, he should easily have *185 been able to give some explanation, for example, of the extent to which Sol used his automobile for business purposes, the business relationship of the unusually large expenditures on Wednesdays (which raises a question, to say the least, since Sol spent Thursdays "on the road"), or the business need for Sol's purported purchases of liquor, soda, and coffee. [5] On the record before us, we think that Dixo has failed to carry its burden of proof. Accordingly, we sustain respondent as to this issue. 652 Issue No. 3 Inclusion of Reimbursed Expenses in Income of Sol It is contended that, despite our disallowance of the corporate deduction for reimbursement of purported selling expenses incurred by Sol, such finding is not determinative of the instant question - i.e., the includability of such reimbursement as additional compensation in the income of Sol. *186 The argument hinges principally on the fact that the amounts included by respondent in income are different and, in two of the taxable years before us, greater than the amounts disallowed as deductions by Dixo. Therefore, it is claimed that respondent's determination was arbitrary. Sol filed his tax returns on a calendar year basis, while Dixo filed on a March 31 fiscal year basis. Thus, the amounts includable in income for each calendar year would inevitably vary from the fiscal year disallowances to Dixo. [6] Moreover, calendar year 1961 contains nine months of Dixo's fiscal 1962 and three months of its fiscal 1961, a year not before us. We find no basis for concluding that the respondent was arbitrary in determining the amounts which he seeks to include in Sol's gross income. Since we have no evidence to support the business purpose of the expenditures for which these amounts constituted reimbursement, other than the evidence already discussed under Issue No. 2, we hold for respondent on this issue. Challenge Manufacturing Co., 37 T.C. 650, 663 (1962). *187 Decision will be entered under Rule 50. *
Footnotes
1. The cases have been consolidated for both trial and opinion.↩
2. Presently, Jerome is a member of the American Society for Testing and Materials, in which he serves on various committees pertaining to halogenated solvents, textiles, and soaps and detergents. He also belongs to the American Association for the Advancement of Science, Tau Beta Pi (Engineering Honor Society), and Alpha Chi Sigma (Professional Chemical Society) and, in addition, serves as a consultant for the Textile Services Management Magazine and the United States Quartermaster Research and Development Laboratory at Natick, Massachusetts, and is an abstractor for the Chemical Abstracts Service, an author in the field of dry cleaning, and, on occasion, a guest speaker at various dry-cleaning association events.↩
3. All references hereinafter are to the Internal Revenue Code of 1954. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;↩
4. In fiscal 1960, Dixo paid Sol a salary of $25,200, which amount was allowed in full by respondent. While the failure of respondent to disallow a deduction in one year is not automatically binding with respect to a later year, it is at least an evidentiary fact to be considered along with other circumstances. Ridgewood Provisions, Inc; 6 T.C. 87 (1946). See also, Seven Canal Place Corporation v. Commissioner, 332 F. 2d 899↩ (C.A. 2, 1964).
5. Since we have no evidence that Sol's activities encompassed overnight travel, expenditures for his own meals would be personal. See United States v. Correll, 389 U.S. 299 (1967); Commissioner v. Bagley, 374 F. 2d 204 (C.A. 1, 1967), vacating and remanding, 46 T.C. 176↩ (1966).
6. A comparison of the totals on the weekly expense statements submitted to Dixo by Sol during calendar year 1963 shows a total of $1,135.55 of disallowed reimbursed expenses. This is very close to the $1,150.25 which respondent included in Sol's gross income for that year.↩
*. By order of the Court "Decision will be entered under Rule 50" was substituted for "In order to reflect the concessions of the parties and our conclusions on the issues above, Decision will be entered under Rule 50 in Docket No. 2236-66. Decision will be entered for the respondent in Docket No. 2237-66."↩