T.C. Memo. 2002-168


UNITED STATES TAX COURT


BARNETT BANKS, INC. & SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 4256-98, 4866-98.     Filed July 10, 2002.


Philip C. Cook, Terence J. Greene, Timothy J. Peaden,
Michelle Marie Henkel, and Charles W. Wheeler, for petitioner.

James F. Kearney, for respondent.


MEMORANDUM OPINION


COHEN, Judge: These consolidated cases are before the Court
on respondent's Motion for Partial Summary Judgment With Respect
to Reserve for Bad Debts and on petitioner's Motion for Summary
Judgment pursuant to Rule 121. Respondent determined

deficiencies, additions to tax, and a penalty in petitioner's

Federal income taxes as follows:

Docket No. 4256-98:

| | | Additions to Tax | | |
| | | Sec.6653 | Sec.6653 | Penalty |
| Year | Deficiency | (a)(1)(A) | (a)(1)(B) | Sec.6661 |
|---|---|---|---|---|
| 12/31/83 | $2,406,964 | -- | -- | -- |
| 12/31/84 | 21,943 | -- | -- | -- |
| 12/31/85 | 472,184 | -- | -- | -- |
| 12/31/86 | 8,322,020 | $468,607 | * | $2,098,710 |
| 12/31/87 | 17,295,902 | 980,439 | * | -- |

*50 percent of the interest due on $8,394,838 and $15,047,884 for 1986 and 1987, respectively.

Docket No. 4866-98:

| Year | Deficiency |
|---|---|
| 12/31/88 | $452,426 |
| 12/31/89 | 1,983,005 |
| 12/31/90 | 404,620 |
| 12/31/91 | 772,825 |
| 12/31/92 | 8,017,277 |
| 12/31/93 | 4,300,188 |
| 12/31/94 | 2,900,914 |

Unless otherwise indicated, all section references are to

the Internal Revenue Code in effect for the years in issue, and

all Rule references are to the Tax Court Rules of Practice and

Procedure. The issue for decision is whether petitioner is

entitled to use the reserve method of accounting for bad debts

under section 593 for the taxable years 1986 through 1994.

Summary judgment is intended to expedite litigation and

avoid unnecessary and expensive trials. Fla. Peach Corp. v.

Commissioner, 90 T.C. 678, 681 (1988). Summary judgment may be

granted with respect to all or any part of the legal issues in controversy "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b); Stubbs v. Commissioner, 797 F.2d 936 (11th Cir. 1986). Respondent asserts that there are material facts in dispute with respect to petitioner's satisfaction of certain tests to qualify for the reserve method in dispute and thus argues that only partial summary judgment is appropriate if we agree with petitioner's interpretation of relevant statutes and regulations. The facts material to the Court's disposition of the cross-motions for summary judgment are stated solely for purposes of deciding the motions and are not findings of fact for these cases. See Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994).

## Background

During the taxable years 1986 through 1994, Barnett Banks, Inc. (Barnett), was an accrual basis bank holding company organized and existing under the laws of the State of Florida, with its principal place of business in Jacksonville, Florida. On January 9, 1998, Barnett merged into NB Holdings, a subsidiary of NationsBank Corp., and thereafter was a wholly owned

subsidiary of NationsBank Corp. On September 30, 1998, Bank America Corp. merged into NationsBank Corp., and, as the surviving entity, NationsBank Corp. changed its name to Bank America Corp. In April 1999, Bank America Corp. changed its name to Bank of America Corp. Bank of America Corp. & Subsidiaries is the successor in interest to Barnett Banks, Inc. & Subsidiaries.

United First Federal Savings and Loan Association (United First Federal) was a Federal stock savings and loan association, organized under the Home Owners' Loan Act (HOLA), ch. 64, 48 Stat. 128 (1933), and its principal place of business was in Sarasota, Florida. Home Federal Bank of Florida, F.S.B. (Home Federal), was a Federal stock savings bank, organized under the HOLA, and its principal place of business was in St. Petersburg, Florida.

On December 22, 1986, Barnett Bank of Southwest Florida became the successor to United First Federal by conversion of corporate charters under the laws of the State of Florida and became a subsidiary of Barnett. Barnett Bank of Southwest Florida had its principal place of business in Jacksonville, Florida.

On July 26, 1987, Barnett Bank of Pinellas County became the successor to Home Federal by conversion of corporate charters under the laws of the State of Florida and became a subsidiary of Barnett. Barnett Bank of Pinellas County had its principal place

of business in Jacksonville, Florida.  On September 28, 1996,
Barnett Bank of Southwest Florida and Barnett Bank of Pinellas
County were merged into Barnett Bank, N.A., a subsidiary of
Barnett.

Barnett's Strategic Plan for Increased Market Share in Florida

During the taxable years 1985 to 1988, the stated mission of
Barnett, a bank holding company, was to provide the highest
quality of services and to use every opportunity to enhance its
position as the preeminent financial institution in the State of
Florida and as one of the leading financial institutions in the
Southeast.  The State of Florida was Barnett's primary focus for
expansion and growth.  One of Barnett's strategic goals in 1985,
1986, and 1987 was to increase its market share of total deposits
in all Florida financial institutions.  In 1983 and 1984, savings
and loan institutions accounted for more than 50 percent of the
deposit market share in the 10 largest counties in Florida,
including Pinellas County, Hillsborough County, and Sarasota
County.  In 1985, the savings and loan institutions accounted for
more than 50 percent of the deposit market share statewide.  In
1985 and 1986, 11 of Florida's top 15 largest financial
institutions in terms of total assets were savings and loan
institutions.

In the first quarter of 1986, Barnett announced that it had
reached separate agreements to acquire United First Federal and

Home Federal in transactions that would be significantly larger than any of its prior acquisitions. Barnett, as a bank holding company, could not make a direct acquisition of the stock of United First Federal or Home Federal because of the Federal Reserve Board's policy that precluded a bank holding company from making a direct acquisition of a healthy savings and loan association or Federal savings bank. As a result, United First Federal and Home Federal were required to convert from a Federal savings and loan association and a Federal savings bank, respectively, to State banking corporations in multistep transactions as a condition to obtaining the Federal Reserve Board's approval for the acquisitions.

Barnett's Acquisition of United First Federal

As of June 30, 1986, United First Federal had 38 branch offices in seven Florida counties, with total assets of $1.6 billion, total deposits of $1.5 billion, and shareholders' equity of $80 million.

United First Federal was a member of the Federal Home Loan Bank System (FHLBS) and was subject to supervision and examination by the Federal Home Loan Bank Board (FHLBB). United First Federal's deposits were insured by the Federal Savings and Loan Insurance Corporation (FSLIC).

Pursuant to the plan for merger, United First Federal completed a two-step conversion of corporate charters under the

laws of the State of Florida on December 22, 1986. First, United First Federal converted from a Federal stock savings and loan association into a Florida stock savings and loan association. Second, United First Federal converted from a Florida stock savings and loan association into a Florida banking corporation known as Barnett Bank of Southwest Florida.

On December 22, 1986, Barnett Bank of Southwest Florida, N.A., a wholly owned subsidiary of Barnett, merged into Barnett Bank of Southwest Florida (Southwest). Thereafter, Southwest became a subsidiary of Barnett and a member of its consolidated group for Federal income tax purposes.

Southwest's deposits were insured by the Federal Deposit Insurance Corporation (FDIC) and, after enactment of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Pub. L. 101-73, sec. 301, 103 Stat. 277 (1989), by the Banking Insurance Fund (BIF).

Southwest was the leader in residential lending in its Florida markets and, from 1992 to 1995, was awarded the Sarasota Herald-Tribune's "Reader's Choice Award" as the best mortgage lender. Southwest's board of directors was composed entirely of persons who served as directors of either Barnett Bank of Southwest Florida, N.A., or United First Federal. In addition, Southwest's executive officers included a combination of the senior management of these two financial institutions.

Immediately after the merger, Southwest conducted its business in United First Federal's facilities using the personnel of both United First Federal and Barnett Bank of Southwest Florida, N.A.

Barnett's Acquisition of Home Federal

As of March 31, 1987, Home Federal had 28 branch offices in four Florida counties and total assets of $1.4 billion, total deposits of $1.3 billion, and shareholders' equity of $115 million. Home Federal was the largest residential mortgage lender in Pinellas County, and, on the basis of total assets, it was the twenty-first largest savings institution in the State of Florida.

Home Federal was a member of the FHLBS and was subject to supervision and examination by the FHLBB. Home Federal's deposits were insured by the FSLIC.

Pursuant to the plan for merger, Home Federal completed a two-step conversion of corporate charters under the laws of the State of Florida on July 26, 1987. First, Home Federal converted from a Federal savings bank into a Florida stock savings and loan association. Second, Home Federal converted from a Florida stock savings and loan association into a Florida banking corporation known as Barnett Bank of Pinellas County.

On July 26, 1987, Barnett Bank of Pinellas County, N.A., a wholly owned subsidiary of Barnett, merged into Barnett Bank of

Pinellas County (Pinellas). Thereafter, Pinellas became a subsidiary of Barnett and a member of its consolidated group for Federal income tax purposes.

Pinellas's board of directors consisted of the current directors of Barnett Bank of Pinellas County, N.A., and Home Federal. In addition, Alfred T. May, the president and chief executive officer of Home Federal, served as the president and chief operating officer of Pinellas. Pinellas also continued to use all employees in the combined organization.

Pinellas's deposits were insured by the FDIC and, after FIRREA, by the BIF.

Bad Debt Reserve Method of Accounting

After their acquisitions by Barnett, Southwest and Pinellas were members of Barnett's consolidated group for Federal income tax purposes. Barnett timely filed (pursuant to extensions) a Form 1120, U.S. Corporation Income Tax Return, for each of its taxable years 1986 through 1994. For all relevant years, petitioner used a fiscal year ended December 31.

For each of the taxable years in issue, Barnett took the position that Southwest and Pinellas qualified as "domestic building and loan associations" within the meaning of section 7701(a)(19); as a result, Barnett claimed a deduction for Southwest's and Pinellas's bad debts based on the reserve method of accounting under former section 593. Barnett attached the

savings and loan qualifications tests for Southwest and Pinellas to each of the returns for the years in issue.

On December 11, 1997, a notice of deficiency was issued for petitioner's taxable years 1983 through 1987. In this notice of deficiency, respondent proposed adjustments to Barnett's taxable income to reverse Southwest's and Pinellas's bad debt reserves, which were calculated under section 593, in the following amounts and taxable years:

| Year | Pinellas | Southwest | Total |
|------|----------|-----------|-------|
| 12/31/86 | -- | $15,848,132 | $15,848,123 |
| 12/31/87 | $37,408,897 | -- | 37,408,897 |

On December 22, 1997, a notice of deficiency was issued for petitioner's taxable years 1988 through 1994. In this notice of deficiency, respondent disallowed Barnett's deductions claimed for Southwest's and Pinellas's bad debt reserves under section 593 in the following amounts and taxable years:

| Year | Pinellas | Southwest | Total |
|------|----------|-----------|-------|
| 12/31/88 | ($1,597,859) | $2,006,462 | $408,603 |
| 12/31/89 | 2,369,843 | 934,603 | 3,304,446 |
| 12/31/90 | (1,713,509) | 20,778 | (1,692,731) |
| 12/31/91 | 2,196,073 | (192,019) | 2,004,054 |
| 12/31/92 | 1,854,512 | 1,544,816 | 3,399,328 |
| 12/31/93 | 643,535 | (914,984) | (271,449) |
| 12/31/94 | 599,905 | (151,366) | 448,539 |

Regulation and Supervision

During the taxable years 1986 through 1994, chapter 655 of title XXXVIII of the Florida Code provided the Florida Department

of Banking and Finance with the authority to supervise and examine all financial institutions chartered under State law, including savings and loan associations, banks, industrial savings banks, trust companies, international bank agencies or representative offices, and credit unions.  Banks and trust companies were subject to the statutory provisions set forth in chapter 658 of title XXXVIII of the Florida Code.  Savings, savings and loan, and building and loan associations were subject to the statutory provisions set forth in chapter 665 of title XXXVIII of the Florida Code.  After FIRREA, the FDIC insured the deposits of banking corporations and of savings and loan associations.

<u>Statutory and Regulatory Provisions</u>

The applicable statutory and regulatory provisions are former section 593 (section 593), which provided a deduction for reserves on bad debts, and section 7701(a)(19) and section 301.7701-13A, Proced. & Admin. Regs., which define "domestic building and loan association" for section 593.

SEC. 593.  RESERVES FOR LOSSES ON LOANS.

(a) Reserve for bad debts.--

(1) In general.--Except as provided in paragraph (2), in the case of--

(A) any domestic building and loan association,

(B) any mutual savings bank, or

       (C) any cooperative bank without capital stock organized and operated for mutual purposes and without profit,

there shall be allowed a deduction for a reasonable addition to a reserve for bad debts. Such deduction shall be in lieu of any deduction under section 166(a).

       (2) Organization must meet 60-percent asset test of section 7701(a)(19).--This section shall apply to an association or bank referred to in paragraph (1) only if it meets the requirements of section 7701(a)(19)(C).

Section 7701 provides:

SEC. 7701.  DEFINITIONS.

       (a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof--

    \*     \*     \*     \*     \*     \*     \*

       (19)Domestic building and loan association.-- The term "domestic building and loan association" means a domestic building and loan association, a domestic savings and loan association, and a Federal savings and loan association--

Section 301.7701-13A, Proced. & Admin Regs., provides:

SEC. 301.7701-13A.  Post-1969 domestic building and loan association.--(a) In general.  For taxable years beginning after July 11, 1969, the term "domestic building and loan association" means a domestic building and loan association, a domestic savings and loan association, a Federal savings and loan association, and any other savings institution chartered and supervised as a savings and loan or similar association under Federal or State law which meets the supervisory test (described in paragraph (b) of this section), the business operations test (described in paragraph (c) of this section), and the assets test (described in paragraph (d) of this section).  \* \* \*

Discussion

The nature of the transactions leading to the dispute in these cases is described by petitioner as follows:

> The acquisitions of United First Federal and Home Federal were undertaken pursuant to Barnett's strategic plan to expand its market share of deposits and real estate lending in the State of Florida.  Barnett would have preferred to acquire these two thrifts pursuant to their existing charters and continue to conduct their business without modification.  However, a misguided Federal Reserve Board policy effective at the time of the acquisitions (but subsequently withdrawn) precluded a bank holding company from owning an entity chartered as a stock savings and loan association unless the entity was failing.  Therefore, Barnett was precluded from directly acquiring the stock of United First Federal and Home Federal.  In order to obtain the Federal Reserve Board's approval of the acquisitions, United First Federal and Home Federal were required to convert to state banking corporations.  United First Federal was immediately merged with a newly organized subsidiary of Barnett that was chartered as a bank under Florida law and continued its residential lending business in Florida as Southwest.  Similarly, Home Federal was immediately merged with a newly organized subsidiary of Barnett that was chartered as a bank under Florida law and continued its residential lending business in Florida as Pinellas.  [Citations omitted.]

The question presented is whether, in carrying out its strategic plan to acquire Southwest and Pinellas, Barnett gave up the favorable tax treatment of accounting for bad debt reserves under section 593 that was previously enjoyed by the two acquired entities.

Simply stated, respondent's position is that Southwest and Pinellas lost qualification to use the reserve method of section 593 when they obtained bank charters and relinquished their

savings and loan charters in order to be acquired by Barnett Bank. Respondent interprets the language of section 7701(a)(19) and of section 301.7701-13A(a), Proced. & Admin. Regs., to preclude use of section 593 by any entity chartered as a bank. Respondent relies on legislative history emphasizing the historically different tax treatment afforded to banks, on the one hand, and to savings and loan associations, on the other.

Petitioner contends that the language of the applicable statutes allows for use of the reserve method of accounting under former section 593 by any association actually functioning as a savings and loan. Petitioner asserts that Southwest and Pinellas functioned the same before and after the change in their charters. Petitioner argues that precedents in the subject areas repeatedly apply substance over form analysis, even when a taxpayer is attempting to repudiate the form that the taxpayer has chosen. Thus, petitioner concludes, the position taken by respondent as to the conclusiveness of the charter should be rejected.

Addressing first the language of section 7701(a)(19) and the related regulation, a straightforward interpretation is that a domestic building and loan association qualifies for the reserve method of accounting under section 593 if it meets three tests-- the supervisory test, the business operations test, and the asset tests set forth in section 7701(a)(19). Petitioner, however,

contends that an institution that satisfies these tests thereby qualifies as a domestic savings and loan association. Section 301.7701-13A(a), Proced. & Admin. Regs., adds to the list of institutions that are domestic building and loan associations "any other savings institution chartered and supervised as a savings and loan or similar association under Federal or State law which meets the * * * [three tests]". According to petitioner, the effect of this regulation is to allow the use of the reserve method of accounting under section 593 by any "similar association" that meets the three tests. Both parties cite the evolution of the term "building and loan association" in the Code and associated legislative history in support of their respective positions.

The definition of a "building and loan association" under section 101(4), I.R.C. 1939, was expanded to include "a domestic building and loan association, a domestic savings and loan association, and a Federal savings and loan association, substantially all the business of which is confined to making loans to members" by the Revenue Act of 1951, ch. 521, sec. 313, 65 Stat. 490. In that Act, Congress eliminated the exemption from Federal income tax for domestic building and loan associations and instead enacted generous rules for calculating deductions for additions to bad debt reserves. Revenue Act of 1951, ch. 521, sec. 313(e), 65 Stat. 490-491. The legislative

history for the 1951 Act indicates: "This amendment is of a clarifying nature and is not intended to change the existing meaning of a domestic building and loan association". S. Rept. 781, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 563-564. Petitioner cites this report in support of its position that, although the definition of a domestic building and loan association has expanded, the law has never required a specific type of charter, thereby excluding those institutions whose substantial business would otherwise qualify for the benefits of the bad debt reserve calculation.

Congress again altered the rules for calculating bad debt reserves for building and loan associations by deleting the reference to "loans to members" and replacing it with the supervisory test, business operations test, and assets test, codified in section 7701(a)(19). Revenue Act of 1962, Pub. L. 87-834, sec. 6(c), 76 Stat. 977.

Respondent asserts that, throughout the evolution of the definition of a domestic building and loan association, the introductory language quoted supra p. 12 has remained in the statute, demonstrating congressional intent to distinguish between entities classified as domestic building and loan associations and banks.

The introductory language of section 7701(a)(19) is also found in section 301.7701-13A(a), Proced. & Admin. Regs. That

regulation includes in the definition of a domestic building and loan association "any other savings institution <u>chartered</u> and supervised as a savings and loan or similar association under Federal or State law" that meets the supervisory test, business operations test, and assets test. Sec. 301.7701-13A(a), Proced. & Admin. Regs. (Emphasis added.) Petitioner seizes upon the phrase "similar association" in an attempt to fit within the definition of a domestic building and loan association.

Petitioner's interpretation of the regulation would have the effect of substituting "any financial institution" for the introductory language in the regulation. The regulation may have been intended to give some flexibility to institutions chartered in States that do not apply the same labels for "building and loan association"; however, to interpret the phrase "similar association" to include any financial institution that meets the supervisory test, business operations test, and assets test of the regulation would require us to ignore the introductory language. We decline to do so in light of the clear intent of Congress to distinguish among financial institutions by incorporating the term "domestic building and loan association" in sections 593(a)(1)(A) and 7701(a)(19).

Respondent also points to the relationship among sections 581, 585, and 593 as confirming the congressional intent to devise a comprehensive statutory scheme for the treatment of

financial institutions.  Section 581 provides a broad definition for the term "bank", while section 585 provides for the reserves for losses on loans to banks.  Section 581 provides:

SEC. 581.  DEFINITION OF BANK.

For purposes of sections 582 and 584, the term "bank" means a bank or trust company incorporated and doing business under the laws of the United States (including laws relating to the District of Columbia) or of any State, a substantial part of the business of which consists of receiving deposits and making loans and discounts, or of exercising fiduciary powers similar to those permitted to national banks under the authority of the Comptroller of the Currency, and which is subject by law to supervision and examination by State, or Federal authority having supervision over banking institutions.  Such term also means a domestic building and loan association.

Section 585 provides:

SEC. 585.  RESERVES FOR LOSSES ON LOANS OF BANKS.

(a) Reserve for Bad Debts.--

(1) In general.--Except as provided in subsection (c), a bank shall be allowed a deduction for a reasonable addition to a reserve for bad debts.  Such deduction shall be in lieu of any deduction under section 166(a).

(2) Bank.--For purposes of this section--

(A) In general.--<u>The term "bank" means any bank (as defined in section 581) other than an organization to which section 593 applies.</u>  [Emphasis added.]

Section 585 and former section 593 provided two different methods for accounting for reserves for bad debts.  Prior to the repeal of the bad debt reserve method for thrift savings associations under section 593, section 585 provided deductions for reasonable

additions to reserves for bad debts for banks, as defined in section 581, and specifically excluded organizations to which section 593 applied.  The distinction between banks and thrift institutions for purposes of the bad debt deduction is also evident in committee reports to the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2376, that define commercial banks to which section 585 applies as:

> a domestic or foreign corporation, a substantial portion of whose business consists of receiving deposits and making loans and discounts, or of exercising fiduciary powers similar to those permitted national banks, and who are subject by law to supervision and examination by State or Federal Authority having supervision over banking institutions (sec. 581).  <u>For the purpose of determining the deductions for bad debts, the term "commercial bank" does not include domestic building and loan associations, mutual savings banks or cooperative nonprofit mutual banks ("thrift institutions").</u>  [H. Conf. Rept. 99-426 (1985), 1986-3 C.B. (Vol. 2) 574; H. Conf. Rept. 99-841 (1986), 1986-3 C.B. (Vol. 4) 326; emphasis added.]

Although, historically, thrift institutions enjoyed more favorable tax treatment than other financial institutions, Congress recognized in the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2376, that changes in regulatory policies had expanded the activities of thrift institutions and encouraged other institutions to expand their activities in areas that were traditionally serviced by the thrift industry.  H. Conf. Rept. 99-426, <u>supra</u>, 1986-3 C.B. at 581.  Acknowledging that other financial institutions were in direct competition with thrift

institutions, Congress substantially reduced the bad debt deduction available to thrift institutions.  By reducing rather than eliminating the bad debt deduction, "the committee continues to believe that there should be some incentive for thrift institutions to provide residential mortgage loans".  Id. at 582. Explanation of the new provisions for calculating bad debt deductions for thrift institutions included the language:  "Any institution meeting the definition of a thrift institution and holding at least 60 percent of its assets as qualifying assets, will be eligible for the full 5 percent of taxable income deduction."  Id.  (Emphasis added.)  The legislative history cited by both parties demonstrates that, while the activities of thrifts and commercial banks began to overlap during the years in issue, a significant distinction remained in both fiscal and regulatory policy that lends credence to respondent's determination that an institution chartered as a bank does not meet the threshold requirements of section 7701(a)(19).

Petitioner relies on several decided cases that, according to petitioner, establish that the laws in this area have been more concerned with the substance of an institution's activities than with the form of its State charter.  For example, in Staunton Indus. Loan Corp. v. Commissioner, 120 F.2d 930 (4th Cir. 1941), revg. 42 B.T.A. 1030 (1940), the Court of Appeals for the Fourth Circuit applied a functional test to determine whether

the taxpayer, chartered as an industrial loan corporation under Virginia State law, qualified as a bank within the meaning of the Revenue Act of 1936, ch. 690, sec. 104, 49 Stat. 1677. Although Virginia State law made a distinction between industrial loan corporations and banks, the court noted that "peculiarities in individual state laws" are not controlling in the interpretation of section 104. Staunton Indus. Loan Corp. v. Commissioner, supra at 933. After analyzing the "sum total of * * * [taxpayer's] business activities", the court concluded that the taxpayer functioned as a bank that Congress intended to include for purposes of section 104. Id. Similarly, in Mut. Sav. & Loan Co. v. Commissioner, 44 B.T.A. 1204 (1941), although the taxpayer was organized as an industrial loan association and not a bank under State law, the substance of its activities qualified for treatment as a bank within the meaning of the Revenue Act of 1936, ch. 690, sec. 104, 49 Stat. 1677. In both cases, the Court rejected State law distinctions between banks and other entities when at odds with the definition of a bank under the Federal statute. Petitioner urges that, under the Staunton and Mutual approach, Southwest and Pinellas continue to qualify as domestic building and loan associations because they functioned the same before and after the mergers and meet the supervisory test, business operations test, and assets test of section 7701(a)(19).

Respondent distinguishes the cases on which petitioner relies and argues that United States v. Cambridge Loan & Bldg. Co., 278 U.S. 55 (1928), is most directly on point. While the Federal statutes at issue in Staunton and Mutual provided a definition for "bank", the statutes in Cambridge and Perpetual Bldg. & Loan Association of Columbia v. Commissioner, 34 T.C. 694 (1960), affd. sub nom. Estate of Cooper v. Commissioner, 291 F.2d 831 (4th Cir. 1961), did not define the term "building and loan association".

In Cambridge, the taxpayer was incorporated in Ohio and was recognized and conducted its business as a building and loan association in accordance with the laws of the State of Ohio. The Revenue Act of 1918, ch. 18, sec. 231, 40 Stat. 1076, and the Revenue Act of 1921, ch. 136, sec. 231, 42 Stat. 253, provided an exemption from income tax for building and loan associations but did not further define such an entity. The U.S. Supreme Court accepted the State's classification of a building and loan association in the absence of a definition in the Federal statute, provided that there had not been a "gross misuse of the name". United States v. Cambridge Loan & Bldg. Co., supra at 59. Respondent also relies on Perpetual Bldg. & Loan Association of Columbia v. Commissioner, supra, in which we stated that, for a building and loan association to qualify for exemption under section 101(4), I.R.C. 1939, the association must first come

within the classification of a building and loan association and that, second, substantially all of its business must be confined to making loans to members. Id. at 710. Because the definition of a building and loan association was not codified in State law, the analysis focused on State law interpretation of the characteristics of a building and loan association, consistent with the second requirement in section 101(4), that substantially all of an association's business must be confined to making loans to members. Id. at 710-711. The Court concluded:

> if a corporation does not substantially meet the
> generally recognized criteria of a bona fide building
> and loan association, it is not such a tax exempt
> association as is contemplated by the statute,
> regardless of what name it may have or how it may be
> designated or classified by the State statute under
> which it was organized. [Id. at 715.]

Respondent asserts that, under the Cambridge analysis, when the Federal statute does not provide a definition, we must rely on the law of the chartering jurisdiction to determine the appropriate definition. Respondent argues that the chartering jurisdiction provides for the separate treatment of entities classified as building and loan associations from that afforded to other financial institutions. Both Southwest and Pinellas were chartered as Florida banking corporations and were, therefore, subject to and operated under the regulatory authority of the Florida Department of Banking and Finance, as were all

financial institutions chartered in the State of Florida.  Fla. Stat. Ann. secs. 655.012, 655.005, 665.012 (West 1984).

Under the Florida financial institutions code, chapter 655 applies to financial institutions generally and provides for "general regulatory powers to be exercised by the Department of Banking and Finance in relation to the regulation of financial institutions".  Fla. Stat. Ann. sec. 655.001 (West 1984). However, the statutory framework for banks is found in chapter 658, while chapter 665 provides guidance to associations.  Fla. Stat. Ann. secs. 658.165, 665.0211, 665.0501, 665.0711 (West 1984).  As defined in chapter 658, the term "bank" does not include an association.  Fla. Stat. Ann. sec. 658.12 (West 1984). An "association" is defined as a mutual or capital stock savings association, savings and loan association, building and loan association, or savings bank.  Fla. Stat. Ann. sec. 665.012 (West 1984).  The name of every "association" must include either the words "savings association", "savings bank", or "savings and loan association".  Fla. Stat. Ann. sec. 665.0211 (West 1984). Chapter 665 also requires associations to invest at least 50 percent of nonliquid assets in real estate loans or interests in home property or primarily residential property.  Fla. Stat. Ann. sec. 665.0711 (West 1984).  The absence of the same requirement for banks and trusts under chapter 658 demonstrates the distinction between financial institutions chartered as

"banks" and those chartered as "savings banks" or "savings and loan associations". This treatment is consistent with the Federal revenue policy that recognizes that thrift institutions have historically been the primary source of residential home mortgages.

Alternatively, petitioner argues that Southwest and Pinellas qualify as "mutual savings banks" as defined in section 591(b). Section 591(b) expands the definition of a "mutual savings bank" for purposes of section 591. Section 591 provides:

SEC. 591. DEDUCTION FOR DIVIDENDS PAID ON DEPOSITS.

(a) In General.--In the case of mutual savings banks, cooperative banks, domestic building and loan associations, and other savings institutions chartered and supervised as savings and loan or similar associations under Federal or State law, there shall be allowed as deductions in computing taxable income amounts paid to, or credited to the accounts of, depositors or holders of accounts as dividends or interest on their deposits or withdrawable accounts, if such amounts paid or credited are withdrawable on demand subject only to customary notice of intention to withdraw.

(b) Mutual Savings Bank to Include Certain Banks With Capital Stock.--For purposes of this part, the term "mutual savings bank" includes any bank--

(1) which has capital stock represented by shares, and

(2) which is subject to, and operates under, Federal or State laws relating to mutual savings bank.

Section 591(b) was enacted in response to changing regulations in the banking industry that allowed mutual savings banks to convert to stock savings banks. H. Conf. Rept. 97-215, at 284-285 (1981). In order to facilitate the conversions and not frustrate regulatory policy, section 591(b) provided that, "for purposes of this part, the term 'mutual savings bank' includes any bank * * * which has capital stock represented by shares, and * * * which is subject to, and operates under, Federal or State laws relating to mutual savings bank". Accordingly, mutual savings banks that converted to stock savings banks continued to qualify as mutual savings banks for purposes of the reserve method of accounting for thrift institutions under section 593. The amendments were intended to "apply to both mutual savings banks which convert into stock associations and to newly formed stock associations so long as the institution is operated as a savings institution and is subject to the same Federal or State regulatory scheme as a mutual savings bank chartered under Federal or State law". H. Conf. Rept. 97-215, at 284-285 (1981).

Petitioner argues that Pinellas and Southwest qualify as mutual savings banks because they were chartered as banks with capital stock represented by shares, as required by section 591(b), and were subject to and operated under the regulatory authority of the Florida Department of Banking and Finance, as

were all State-chartered mutual savings banks. Fla. Stat. Ann. secs. 655.012, 655.005, 665.012 (West 1984). Respondent's position with respect to section 591(b) is a reiteration of the position that Southwest and Pinellas, as commercial banks, are necessarily excluded from the types of institutions eligible for the special reserve method of accounting under section 593.

As previously discussed, although chapter 655 applies to financial institutions generally, Florida law distinguishes between institutions chartered as mutual savings banks under chapter 665 and those chartered as banks under chapter 658. Fla. Stat. Ann. secs. 665.012, 655.005 (West 1984). Both Southwest and Pinellas were chartered as banks under chapter 658 and, therefore, were not subject to and were not operated under the same statutory provisions that apply to mutual savings banks and associations as contemplated by section 591(b).

The nature of the disputes between the parties in these cases convinces us that the emphasis that respondent places on a charter is justified. If any financial institution were permitted to use the reserve method of accounting under section 593 and then, when challenged, to argue that the nature of its operations was controlling, the administration of section 7701(a)(19), section 593, and related regulatory provisions would be a practical nightmare. Petitioner's position would add

confusion and uncertainty to the law, while the statutory history shows an intention by Congress to provide certain tax benefits to savings and loan institutions while denying them to banks. By incorporating a definition or "meaning" into the statute, Congress attempted to draw the line, while recognizing that different terminology was used in different State laws and under different State regulatory or supervisory structures.

Petitioner's strategic decision to expand its market share in Florida was undertaken with the knowledge that the acquisition of thrift institutions would require their conversion to banking corporations under Florida law. As the U.S. Supreme Court has often stated: "while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not." Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974).

Based on the statutory framework and relevant legislative history, we conclude that a financial institution chartered as a bank cannot meet the threshold requirements of section 7701(a)(19). Therefore, because Pinellas and Southwest were chartered as banks under Florida law, petitioner is not entitled to use the reserve method of accounting for bad debts under

section 593.  Respondent's Motion for Partial Summary Judgment with Respect to Bad Debts will be granted, and petitioner's Motion for Summary Judgment will be denied.

To reflect the foregoing,

<u>An appropriate order</u>

<u>will be issued</u>.